******************************************

The ''officially released'' date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the ''officially released'' date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

# STATE OF CONNECTICUT *v.* WAGNER GOMES
## (SC 20407)

Robinson, C. J., and McDonald, D'Auria,
Mullins, Ecker and Keller, Js.

*Syllabus*

Convicted of the crime of assault in the second degree, the defendant
appealed to the Appellate Court, claiming that the trial court had
deprived him of his right to present a defense of investigative inadequacy
by omitting from its jury instructions certain language in his written
request to charge stating that the jury could consider evidence of the
police investigation as it might relate to any weaknesses in the state's
case. At trial, the defendant contended that the victim had either mistak-
enly or intentionally misidentified him as the person who assaulted
her and that, if the police had conducted even a minimally adequate
investigation of the incident, they would have discovered this to be the
case. In support of his contention, the defendant adduced testimony
from a number of witness regarding the inadequacy of the police investi-
gation. The Appellate Court affirmed the trial court's judgment, conclud-
ing that the investigative inadequacy instruction that the trial court had
given did not mislead the jury or otherwise deprive the defendant of
his right to present an investigative inadequacy defense. In reaching its
conclusion, the Appellate Court noted that the trial court's instruction
was identical to the model jury instruction provided on the Judicial
Branch website and consistent with investigative inadequacy instruc-
tions approved by this court in *State* v. *Collins* (299 Conn. 567) and
*State* v. *Williams* (169 Conn. 322). The Appellate Court also rejected
the defendant's contention that, in light of recent developments in the
law, as indicated in this court's recent decision in *State* v. *Wright* (322
Conn. 270), the model instruction no longer reflected the correct state-
ment of the law. On the granting of certification, the defendant appealed
to this court, renewing his claim in the Appellate Court challenging the
propriety of the trial court's investigative inadequacy instruction. While
this appeal was pending, the defendant was deported, and the record
did not disclose the basis for his deportation. *Held*:
1. The defendant's appeal was not rendered moot because of his deportation,
as this court's mootness doctrine recognizes reputational damage as a
cognizable, collateral consequence of a criminal conviction, and, if the
defendant should prevail on the merits, it will remove the stain of the
underlying conviction from his record.
2. The Appellate Court incorrectly determined that the trial court's investiga-
tive inadequacy instruction did not mislead the jury or otherwise deprive
the defendant of his right to present an investigative inadequacy defense,
there having been a reasonable possibility that the jury was misled by
the trial court's instruction: in light of *Williams*, *Collins* and *Wright*,
this court concluded that the model jury instruction utilized by the trial
court failed to inform the jury of a defendant's right to rely on relevant
deficiencies or lapses in the police investigation to raise the specter of
a reasonable doubt and the jury's concomitant right to consider any
such deficiencies in evaluating whether the state has proven its case
beyond a reasonable doubt, and the language that the defendant
requested to be added to the model instruction would have properly
apprised the jury of the defendant's right to present an investigative
inadequacy defense and its right to consider it in evaluating the strength
of the state's case; moreover, there was a significant risk that the instruc-
tion given by the trial court improperly led the jury to believe that it
could not consider the defendant's arguments concerning the adequacy
of the police investigation, because, instead of apprising the jury that
reasonable doubt could be found to exist if it concluded that the investi-
gation was careless, incomplete or so focused on the defendant that
it ignored leads that may have suggested other culprits, there was a
reasonable possibility that the instruction had the opposite effect and
caused the jury to believe that it was precluded from considering any
such evidence; furthermore, given the weakness of the state's case, the

instructional error was harmful, as the state's case against the defendant rested almost entirely on the believabilty of the victim's testimony identifying the defendant as the perpetrator, which the defendant sought to refute by directing the jury's attention to the alleged inadequacies in the police investigation.

*State* v. *Aquino* (279 Conn. 293), to the extent that it held that a defendant's deportation during the pendency of his or her appeal renders the appeal moot when the record does not disclose whether the defendant's guilty plea was the sole reason for his deportation, overruled.

Argued September 15, 2020—officially released January 26, 2021*

*Procedural History*

Substitute information charging the defendant with the crime of assault in the second degree, brought to the Superior Court in the judicial district of Fairfield, geographical area number two, and tried to the jury before *Doyle, J.*; verdict and judgment of guilty, from which the defendant appealed to the Appellate Court, *Alvord*, *Moll* and *Bear, Js.*, which affirmed the trial court's judgment, and the defendant, on the granting of certification, appealed to this court. *Reversed*; *new trial*.

*Lisa J. Steele*, assigned counsel, for the appellant (defendant).

*Timothy J. Sugrue*, assistant state's attorney, with whom, on the brief, were *Cornelius Kelly*, acting state's attorney, and *Margaret E. Kelley*, state's attorney, for the appellee (state).

*Opinion*

KELLER, J. The defendant, Wagner Gomes, appeals[1] from the judgment of the Appellate Court affirming his conviction, rendered following a jury trial, of assault in the second degree in violation of General Statutes § 53a-60 (a) (2). The defendant claims that the Appellate Court incorrectly determined that the trial court's investigative inadequacy jury instruction did not mislead the jury or otherwise deprive him of his right to present an investigative inadequacy defense. We agree and, accordingly, reverse the judgment of the Appellate Court.

The opinion of the Appellate Court sets forth the following relevant facts and procedural history. "In the early morning hours of September 12, 2015, the victim, Edilene Brandao, along with several other persons, including Raphael Morais, attended a birthday party at the Brazilian Sports Club (club), located at 29 Federal Street in Bridgeport. Shortly after arriving, the victim had one drink, and Morais went to the bar to get a drink for himself. Morais confronted the defendant's girlfriend, who was at the bar, pushed her, and made offensive remarks to her. A fight then broke out inside the club between the defendant and Morais. Security guards intervened and separated them. The defendant was taken outside, and Morais was taken to the [club's] patio.

"The victim went to the patio with Morais. There was a fence at the back of the patio, and the victim had her back to that fence. The victim proceeded to ask Morais why he was fighting, and Morais responded, 'it's him.' The victim then turned to face the fence and saw the defendant standing approximately two feet away from her, on the outside of the fence, with a bottle in his hand. The defendant then struck the victim on the forehead with the bottle.

"The club's owner, Demetrio Ayala, Jr., knew the defendant because he visited the club several times per month. Ayala observed the [earlier] fight between the defendant and another person known to him as 'Rafael.'[2] [Ayala ordered the club's security guards to separate the defendant and Morais, and to take the defendant outside and Morais to the patio. Soon thereafter] Ayala, after hearing shouting on the patio, went to investigate and discovered that the victim was bleeding. Ayala then went out the front door of the club in order to try to find the defendant, [who had just been taken outside of the club by a security guard, to see if he was near enough to the outside of the fence surrounding the patio to be involved in the victim's injuries. Ayala observed the defendant] in the parking lot running away from the club. Ayala subsequently called the police.

"Before the police arrived, the victim was transported to St. Vincent's Medical Center in Bridgeport by private

car in the company of several persons who were in the club that night. She arrived at the hospital at about 12:30 a.m., where she was seen by a triage nurse and received treatment for the bleeding and pain. Several hours later, the victim was also treated by a plastic surgeon and then released.[3]

"John Topolski and Matthew Goncalves, officers with the Bridgeport Police Department, were among the first police officers to arrive at the club shortly after 1:30 a.m. Upon their arrival, they observed that '[the scene] was a mess' and that 'there [were] maybe [100] people scattered amongst the streets.' Officer Topolski briefly spoke with Morais, who had, he observed, a swollen face, one eye that was swollen shut, profuse facial bleeding, clothes covered in blood, and an apparently dislocated shoulder.[4] Once the scene was secure, the officers departed for the hospital, intending to question Morais, who also had been taken to the hospital before the police completed their initial on-site investigation. While the officers were en route to the hospital, they received a radio dispatch informing them that a woman, who also had been injured at the club, was already at the hospital.

"When the officers arrived at the hospital, Officer Topolski went in search of the injured woman, and Officer Goncalves went in search of Morais. Although Officer Goncalves located Morais, he was unable to speak with Morais because his wounds were being treated, and he was being prepared for surgery. Officer Topolski located the victim in the waiting area of the hospital's emergency department and identified her as the woman who had been injured at the club. The victim was in the company of approximately five other individuals. Officer Topolski observed that the victim was crying and visibly shaken. She had blood covering her face and was holding gauze to her head. Despite her physical and emotional condition, the victim was coherent enough to provide information to Officer Topolski. In her verbal statement to Officer Topolski, the victim denied that Morais may have been the aggressor in some type of altercation with her. Officer Topolski, while he was at the hospital, also obtained the name of the defendant, but it was not clear from whom he received that information.[5]

"On October 2, 2015, the victim went to the Bridgeport police station with her attorney, where she was interviewed by Detective Paul Ortiz in the presence of Sergeant Gilbert Valentine about the events that occurred on September 12, 2015. Detective Ortiz reviewed Officer Topolski's report of the events. Through this report, Detective Ortiz learned that the defendant might be a suspect. Detective Ortiz prepared a photographic array that included a photograph of the defendant, which he showed to the victim. When the victim viewed the photograph of the defendant, she

became emotional and started to cry. She examined the entire array and then selected the defendant's photograph, on which she wrote that she was '100 percent' confident that he was the person who had attacked her. The defendant was subsequently arrested.

"At trial, the defendant sought to persuade the jury that reasonable doubt existed regarding the victim's identification of the defendant as the person who assaulted her. The main defense advanced by the defendant was that the police had conducted an inadequate investigation of the incident.

"During closing arguments, defense counsel argued that 'this case screams reasonable doubt. . . . [T]he police completely failed in this case, and they completely failed [the victim]. They didn't go back to that scene that night. They didn't identify the crime scene. They didn't take any photos so that you, ladies and gentlemen, could see how the scene looked that night. How the lighting looked. They never tried to get any surveillance video. . . . They didn't confirm what happened.' Defense counsel also argued that the police 'spent ninety minutes on this investigation,' and that the case 'boil[ed] down to one witness and what she saw in a split second, and she may very well believe that [the defendant] did this to her. But the police did nothing to confirm as to what Officer Goncalves said they needed to do.'[6]

"In connection with his defense of inadequate police investigation, the defendant had filed a written request to charge the jury, which provided in relevant part: '[1] You have heard some arguments that the police investigation was inadequate and biased. [2] The issue for you to decide is not the thoroughness of the investigation or the competence of the police. [3] However, you may consider evidence of the police investigation as it might relate to any weaknesses in the state's case. [4] Again, the only issue you have to determine is whether the state, in light of all the evidence before you, has proved beyond a reasonable doubt that the defendant is guilty of the counts with which he is charged.'

"On October 27, 2018, the court held a charge conference. In discussing the final charge, the court told defense counsel that it would be charging on the adequacy of the police investigation, in a form that was somewhat similar to the defendant's requested instruction, but that '[its instruction] may be a little bit different.'

"The court instructed the jury in relevant part: 'You have heard some arguments that the police investigation was inadequate and that the police involved in the case were incompetent or biased. The issue for you to decide is not the thoroughness of the investigation or the competence of the police. The only issue you have

to determine is whether the state, in light of all the evidence before you has proved beyond a reasonable doubt that the defendant is guilty of the counts with which he was charged.' Defense counsel objected to the court's omission of point three of his requested instruction.

"The jury subsequently found the defendant guilty of assault in the second degree . . . . The court rendered judgment in accordance with the jury's verdict and imposed a total effective sentence of five years of imprisonment, execution suspended after two years, followed by three years of probation." (Footnote added; footnotes in original; footnotes omitted.) *State* v. *Gomes*, 193 Conn. App. 79, 81–86, 218 A.3d 1063 (2019). The defendant appealed to the Appellate Court, claiming that "the jury instructions, as given, deprived him of his right to present a defense of investigative inadequacy. Specifically, the defendant argue[d] that the [trial] court erred in failing to include point three of his requested jury charge, which [provides]: 'However, you may consider evidence of the police investigation as it might relate to any weaknesses in the state's case.' The defendant argue[d] that without the inclusion of this requested sentence, the jury would not 'have understood how to use the evidence [defense counsel] was able to elicit about the inadequacies of [the police investigation].' " Id., 86.

The Appellate Court rejected the defendant's claim, noting that the instruction given by the trial court was (1) identical to the model criminal jury instruction on investigative inadequacy provided on the Judicial Branch website,[7] and (2) consistent with investigative inadequacy instructions approved by this court in *State* v. *Collins*, 299 Conn. 567, 598, 10 A.3d 1005, cert. denied, 565 U.S. 908, 132 S. Ct. 314, 181 L. Ed. 2d 193 (2011),[8] and *State* v. *Williams*, 169 Conn. 322, 335 n.3, 363 A.2d 72 (1975),[9] and by the Appellate Court in *State* v. *Nieves*, 106 Conn. App. 40, 57–58, 941 A.2d 358, cert. denied, 286 Conn. 922, 949 A.2d 482 (2008),[10] and *State* v. *Tate*, 59 Conn. App. 282, 284–85, 755 A.2d 984, cert. denied, 254 Conn. 935, 761 A.2d 757 (2000).[11] See *State* v. *Gomes*, supra, 193 Conn. App. 87–89. The Appellate Court also rejected the defendant's contention that this court's recent decision in *State* v. *Wright*, 322 Conn. 270, 140 A.3d 939 (2016), signaled a marked development in our jurisprudence on the investigative inadequacy defense, thus calling into question the continued adequacy of the instructions approved in earlier cases. *State* v. *Gomes*, supra, 92. The Appellate Court determined that the defendant's reliance on *Wright* was misplaced because that case "did not consider the adequacy of a jury instruction on an investigative inadequacy defense" and because, to the extent this court expressed any views on the substance of that defense, they were fully consistent with the views expressed in *Collins*. Id., 92–93.

Finally, the Appellate Court observed that, in its instructions regarding reasonable doubt, the trial court had advised the jury that "[a] reasonable doubt may arise from the evidence itself *or from a lack of evidence*." (Emphasis in original; internal quotation marks omitted.) Id., 95. On the basis of this instruction, and the trial court's investigative inadequacy instruction, which "repeated to the jury its responsibility to determine whether the state, in light of all of the evidence, had proved beyond a reasonable doubt that the defendant was guilty of the count with which he was charged," the Appellate Court concluded that "the jury was not misled by the instructions given . . . ." Id. This certified appeal followed.

I

Following submission of the parties' briefs to this court, the defendant was deported to Cape Verde. Because the record on appeal did not disclose the basis for the defendant's deportation,[12] we directed the parties to submit supplemental briefs addressing whether the defendant's removal from the United States had rendered the appeal moot[13] under *State* v. *Aquino*, 279 Conn. 293, 901 A.2d 1194 (2006), and *State* v. *Jerzy G.*, 326 Conn. 206, 162 A.3d 692 (2017). We did so because, in *Aquino*, this court held that a defendant's deportation during the pendency of his appeal had rendered his appeal moot insofar as the record did not disclose whether his guilty plea was the sole reason for his deportation, and, as a result, it was not clear whether we could afford him any practical relief. *State* v. *Aquino*, supra, 298. In *Jerzy G.*, however, we questioned whether *Aquino* was correctly decided, noting that the decision "[o]n its face . . . appear[ed] to be inconsistent with our collateral consequences jurisprudence"; *State* v. *Jerzy G.*, supra, 220; particularly the well established "presumption of collateral consequences," which attaches automatically to criminal convictions. Id., 223 n.6. Because, however, we could resolve *Jerzy G.* without deciding that question, we left it for another day. Id., 223 and n.6. That day has come. For the reasons set forth hereinafter, we conclude that *Aquino* was wrongly decided and must be overruled. We further conclude that the defendant's appeal is not moot because a favorable decision on the merits can provide the defendant with a measure of practical relief.

It is well settled that "[a] case is considered moot if [the] court cannot grant the [litigant] any practical relief through its disposition of the merits . . . . Under such circumstances, the court would merely be rendering an advisory opinion, instead of adjudicating an actual, justiciable controversy." (Citation omitted; internal quotation marks omitted.) Id., 213. The general principles guiding our mootness analysis are well established. "The doctrine of mootness is rooted in the same policy interests as the doctrine of standing, namely, to assure

the vigorous presentation of arguments concerning the matter at issue. See H. Monaghan, 'Constitutional Adjudication: The Who and When,' 82 Yale L.J. 1363, 1384 (1973) (describing mootness as the doctrine of standing set in a time frame: [t]he requisite personal interest that must exist at the commencement of the litigation [standing] must continue throughout its existence [mootness]). . . . [T]he standing doctrine is designed to ensure that courts and parties are not vexed by suits brought to vindicate nonjusticiable interests and that judicial decisions which may affect the rights of others are forged in hot controversy, with each view fairly and vigorously represented. . . . Justiciability requires (1) that there be an actual controversy between or among the parties to the dispute . . . (2) that the interests of the parties be adverse . . . (3) that the matter in controversy be capable of being adjudicated by judicial power . . . and (4) that the determination of the controversy will result in practical relief to the complainant. . . .

"The first factor relevant to a determination of justiciability—the requirement of an actual controversy—is premised upon the notion that courts are called upon to determine existing controversies, and thus may not be used as a vehicle to obtain advisory judicial opinions on points of law. . . . Moreover, [a]n actual controversy must exist not only at the time the appeal is taken, but also throughout the pendency of the appeal. . . . When, during the pendency of an appeal, events have occurred that preclude an appellate court from granting any practical relief through its disposition of the merits, a case has become moot. . . .

"This court has recognized, however, that a case does not necessarily become moot by virtue of the fact that . . . due to a change in circumstances, relief from the actual injury is unavailable. We have determined that a controversy continues to exist, affording the court jurisdiction, if the actual injury suffered by the litigant potentially gives rise to a collateral injury from which the court can grant relief." (Citations omitted; internal quotation marks omitted.) *State* v. *McElveen*, 261 Conn. 198, 204–205, 802 A.2d 74 (2002). "[F]or a litigant to invoke successfully the collateral consequences doctrine, the litigant must show that there is a reasonable possibility that prejudicial collateral consequences will occur. . . . This standard provides the necessary limitations on justiciability underlying the mootness doctrine itself. Where there is no direct practical relief available from the reversal of the judgment . . . the collateral consequences doctrine acts as a surrogate, calling for a determination whether a decision in the case can afford the litigant some practical relief in the future. The reviewing court therefore determines, based upon the particular situation, whether, the prejudicial collateral consequences are reasonably possible." Id., 208.

In applying these principles, we have long held that a conclusive presumption of prejudicial collateral consequences attaches to criminal convictions not only because of the undesirable legal disabilities they impose, but also because of the damage they cause to a defendant's reputation. See, e.g., *State* v. *Jordan*, 305 Conn. 1, 10 n.9, 44 A.3d 794 (2012) ("since collateral legal disabilities are imposed as a matter of law because of a criminal conviction, a case will not be declared moot even [when] the sentence has been fully served" (internal quotation marks omitted)); *Putman* v. *Kennedy*, 279 Conn. 162, 176 n.14, 900 A.2d 1256 (2006) ("the collateral consequences doctrine applies when the collateral consequences of the contested court action, such as the continuing stigma of a criminal conviction, constitute a continuing injury to the specific litigant, justifying the court's retention of jurisdiction over the dispute, despite the lack of any consequences flowing from the adjudication directly at issue in the appeal" (internal quotation marks omitted)); *Putman* v. *Kennedy*, supra, 172 ("inasmuch as we previously have recognized the importance of reputation damage as a collateral consequence in other contexts, we see no reason not to do so here, for being the subject of a court order intended to prevent or stop domestic violence may well cause harm to the reputation . . . of the defendant"); see also *Williams* v. *Ragaglia*, 261 Conn. 219, 231, 802 A.3d 778 (2002) (appeal was not moot because "revocation of a foster care license for cause stigmatizes the plaintiff as having been found to be an unfit caregiver"); *State* v. *McElveen*, supra, 261 Conn. 215 (defendant's appeal from probation revocation was not moot because revocation may "affect his standing in the community in its connotation of wrongdoing" (internal quotation marks omitted)); *Statewide Grievance Committee* v. *Whitney*, 227 Conn. 829, 838 n.13, 633 A.2d 296 (1993) ("collateral consequences for an attorney's reputation and professional standing make it clear that the defendant's appeal from his suspension is not moot"); *State* v. *Collic*, 55 Conn. App. 196, 201, 738 A.2d 1133 (1999) (removal of probation violation from defendant's record would delete "mark that would otherwise . . . affect his reputation in the community").

In *Aquino*, however, without any discussion of the foregoing principles, this court dismissed the appeal of the defendant, Mario Aquino, as moot, stating that, "[w]hile this appeal was pending, [Aquino] was deported. There is no evidence in the record as to the reason for his deportation. If it was not the result of his guilty plea alone, then this court can grant no practical relief and any decision rendered by this court would be purely advisory." (Footnote omitted.) *State* v. *Aquino*, supra, 279 Conn. 298. As we later explained in *State* v. *Jerzy G.*, supra, 326 Conn. 220–21, although the court in *Aquino* cited no authority for the proposition

that we could not afford Aquino practical relief unless he could establish that his guilty plea was the sole basis for his deportation, it appears that the court, in reaching that decision, followed federal case law addressing this issue, specifically *Perez* v. *Greiner*, 296 F.3d 123 (2d Cir. 2002), which held that, "when a conviction, other than the one being challenged, results in a deportee's permanent ban from reentering this country, the deportee cannot establish collateral injury even if the challenged conviction also is an impediment to reentry. See [id., 126] ('because [the petitioner] is permanently inadmissible to this country due to his prior drug conviction, collateral consequences cannot arise from the challenged robbery conviction, and the petition is moot')." (Emphasis omitted.) *State* v. *Jerzy G.*, supra, 221.

It is apparent, however, that the court's reliance in *Aquino* on *Perez* was mistaken because this court is not bound by federal mootness principles, which are "based on the justiciability requirements applicable to the federal courts under article three of the United States constitution. . . . In deciding issues of mootness, this court is not constrained by article three, § 2, or the allocation of power between the state and federal governments.[14] Our state constitution [provides that] . . . the jurisdiction of [the] courts shall be defined by law. Conn. Const., art. V, § 1. . . . Our mootness jurisprudence, therefore, has evolved under our common law." (Citations omitted; footnote added; internal quotation marks omitted.) *State* v. *McElveen*, supra, 261 Conn. 211–12; see also *Andross* v. *West Hartford*, 285 Conn. 309, 329, 939 A.2d 1146 (2008) (noting that, for purposes of standing, this court is "not required to apply federal precedent in determining the issue of aggrievement" (internal quotation marks omitted)).

One significant difference between our mootness doctrine and that of the federal courts, which is ultimately dispositive of the jurisdictional question presented in this appeal and should have been dispositive in *Aquino*, is that federal law does not recognize reputational damage as a cognizable collateral consequence of a criminal conviction, only concrete legal disabilities.[15] See, e.g., *Spencer* v. *Kemna*, 523 U.S. 1, 16 n.8, 118 S. Ct. 978, 140 L. Ed. 2d 43 (1998) (damage to reputation was insufficient collateral consequence of criminal conviction to avoid dismissal on mootness grounds); *Foretich* v. *United States*, 351 F.3d 1198, 1212 (D.C. Cir. 2003) ("[o]ur case law makes clear that [when] reputational injury is the lingering effect of an otherwise moot aspect of a lawsuit, no meaningful relief is possible"); *United States* v. *Probber*, 170 F.3d 345, 349 (2d Cir. 1999) (noting that, in criminal cases, federal courts "[reject] the notion that the possibility of vindicating a reputational interest of the sort asserted here [is] sufficient to avoid mootness"); *Wickstrom* v. *Schardt*, 798 F.2d 268, 270 (7th Cir. 1986) (holding that collateral

consequences must be serious legal consequences, not mere injury to reputation).

As we have explained, our mootness doctrine does recognize the collateral consequence of reputational damage. See, e.g., *State* v. *Jerzy G.*, supra, 326 Conn. 225 ("if the defendant's appeal is deemed to be moot, he will have been deprived of the only avenue to remove [the] stain [to his reputation]" caused by underlying guilty plea); *Putman* v. *Kennedy*, supra, 279 Conn. 172, 175 (recognizing importance of reputation damage as collateral consequence in determining that defendant's appeals were not moot). Indeed, "the citizens of this state have placed such value on one's interests in his or her reputation as to afford it constitutional protection. See Conn. Const., art. I, § 10 ('[a]ll courts shall be open, and every person, for an injury done to him in his person, property or reputation, shall have remedy by due course of law, and right and justice administered without sale, denial or delay')." *Williams* v. *Ragaglia*, supra, 261 Conn. 232–33; see id. (rejecting mootness challenge to court's jurisdiction). Accordingly, we conclude that *Aquino* was wrongly decided and must be overruled. We further conclude that the defendant's appeal is not moot because, should he prevail on the merits, it will remove the stain of the underlying conviction from his record. We turn, therefore, to the merits of the appeal.

II

The defendant claims that the Appellate Court incorrectly determined that the trial court's investigative inadequacy instruction did not mislead the jury or otherwise prejudice his constitutional right to present a defense of investigative inadequacy. As previously indicated, the Appellate Court rejected the defendant's claim of instructional error, concluding that the challenged instruction was an accurate statement of the law and sufficient to guide the jury in reaching a verdict because the instruction was (1) identical to the model jury instruction on investigative inadequacy on the Judicial Branch website, and (2) "[n]early identical" to instructions this court and the Appellate Court have upheld in prior cases. *State* v. *Gomes*, supra, 193 Conn. App. 88–89. The Appellate Court also rejected the defendant's contention that, even if the model instruction was once considered a correct statement of the law, it was no longer correct in light of recent developments in the law. Id., 91–93.

On appeal to this court, the defendant renews his claim before the Appellate Court, including his assertion that the model jury instruction, though similar in some respects to the instructions approved in *Williams* and *Collins*, is missing critical language that saved the instructions in those cases from constitutional infirmity, namely, "the defense was entitled to make an investigation and put on evidence before you." The

defendant argues that, although the omitted language is not as clear a statement of the right to present an investigative inadequacy defense as the statement in *Collins* that "[a] defendant may . . . rely upon relevant deficiencies or lapses in the police investigation to raise the specter of reasonable doubt"; *State* v. *Collins*, supra, 299 Conn. 599–600; it nevertheless conveys "that the defendant's investigative evidence and arguments are legitimate grist for the jury's mill." According to the defendant, by omitting this pivotal language from the model jury instruction—language that was included in the instructions approved in *Williams* and *Collins*— and by then instructing the jury that, although it had "heard some arguments that the police investigation was inadequate and that the police involved in the case were incompetent," the issue it must decide was "not the thoroughness of the investigation or the competence of the police," the trial court effectively instructed the jury *not* to consider the defendant's arguments regarding the inadequacy of the investigation in assessing reasonable doubt.

The state argues, in response, that the trial court's instruction was not improper because it highlighted the defendant's investigative inadequacy arguments, reminded the jury that its core responsibility was not to evaluate the adequacy of the investigation in the abstract, but to determine whether the defendant was guilty of the charged offenses beyond a reasonable doubt, and accords with existing Connecticut law on investigative inadequacy instructions. We agree with the defendant that there is a reasonable possibility that the jury was misled by the trial court's investigative inadequacy instruction, and, therefore, the defendant is entitled to a new trial.

The following additional facts are relevant to our resolution of the defendant's claim. As previously indicated, the defendant requested that the trial court instruct the jury that it could "consider evidence of the police investigation as it might relate to any weaknesses in the state's case" in light of his contention at trial that the victim had misidentified him as her assailant, either mistakenly or intentionally to protect Morais, the actual assailant, and that, if the police had conducted even a minimally adequate investigation, they would have realized this to be the case. In support of this contention, the defendant adduced the testimony of his then girlfriend, Juliele Silver Ferreira, who testified that she was at the club with the defendant on the night in question and that they had left after his altercation with Morais but before the victim was assaulted. The defendant further adduced the testimony of Ayala, the club owner, and his wife, Debroa Moncio, that Morais was beaten up by a group of club patrons immediately after the victim sustained her injuries. The defendant also elicited testimony from Officers Topolski and Goncalves, the first two officers to arrive on the scene, that, when

they were dispatched to the club, they were informed by the dispatcher that Morais was a suspect in the assault but that neither officer ever investigated Morais as a suspect. Detective Ortiz testified that, when he interviewed Morais, he viewed him as a witness or a victim but not as a suspect.[16]

Officers Topolski and Goncalves further testified that, upon arriving at the club, they were approached by several club patrons claiming to have information about the assault, but they did not ask for the names or contact information for any of these witnesses or ever attempt to interview them regarding what they had seen. Officers Topolski and Goncalves further acknowledged never interviewing Ayala or any of the club's staff who were working there that evening to determine whether they had heard or seen anything that might aid the investigation. Finally, the victim testified that she had never met or seen the defendant prior to the night in question and that she had only a "split second" to observe her attacker.

In light of this and other testimony, defense counsel argued to the jury that, although the state's case relied entirely on the victim's identification of the defendant, the police "did nothing" to confirm the accuracy of that identification. In particular, defense counsel argued that the police never investigated reports they had received on the night in question that Morais, who was beaten by club patrons immediately after the victim was assaulted, was the actual perpetrator. As a consequence, defense counsel argued that the state had not proven its case beyond a reasonable doubt.

The following well established legal principles guide our analysis of the defendant's claim. "[A] fundamental element of due process of law is the right of a defendant charged with a crime to establish a defense. . . . Where . . . the challenged jury instructions involve a constitutional right, the applicable standard of review is whether there is a reasonable possibility that the jury was misled in reaching its verdict. . . . In evaluating the particular charges at issue, we must adhere to the well settled rule that a charge to the jury is to be considered in its entirety, read as a whole, and judged by its total effect rather than by its individual component parts. . . . [T]he test of a court's charge is . . . whether it fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law." (Internal quotation marks omitted.) *State* v. *Collins*, supra, 299 Conn. 598–99. "If a requested charge is in substance given, the court's failure to give a charge in exact conformance with the words of the request will not constitute a ground for reversal. . . . As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view the instructions as improper. . . . Additionally, we have noted that [a]n

error in instructions in a criminal case is reversible error when it is shown that it is reasonably possible for errors of constitutional dimension or reasonably probable for nonconstitutional errors that the jury [was] misled." (Citations omitted; internal quotation marks omitted.) *State* v. *Aviles*, 277 Conn. 281, 309–10, 891 A.2d 935, cert. denied, 549 U.S. 840, 127 S. Ct. 108, 166 L. Ed. 2d 69 (2006). "A challenge to the validity of jury instructions presents a question of law over which [we have] plenary review." (Internal quotation marks omitted.) *State* v. *Collins*, supra, 599.

In *Williams*, this court considered for the first time a claim of instructional error relating to "a statement in the [jury] charge relative to the competence of the police investigation." *State* v. *Williams*, supra, 169 Conn. 334–35. The instruction provided: "Now, you have heard in the course of arguments discussion as to whether the police conducted a thorough search. You have also heard some discussion about the competency of the police in this arrest. Now, ladies and gentlemen, this question might be a matter of opinion, but the [s]tate has put its evidence before you, and the defense was entitled to make an investigation and put its evidence before you also, and, of course, not only the [s]tate but also the defense has put on evidence on behalf of the defendant. I say to you, ladies and gentlemen, that the issue before you is not the thoroughness of the investigation or the competence of the police. This issue you have to determine is whether the [s]tate in the light of all the evidence before you has proved beyond a reasonable doubt that the defendant is guilty on one or both counts with which he is charged." (Internal quotation marks omitted,) Id., 335 n.3; see also footnote 9 of this opinion. Without discussing the particulars of the claim or the legal basis for it, the court concluded that the challenged instruction "gave the jury a clear understanding of the issues involved and a proper guidance in determining those issues." Id., 336.

In *Collins*, however, this court took a closer look at the right to present a defense based on the inadequacy of a police investigation, explaining in relevant part: "In the abstract, whether the government conducted a thorough, professional investigation is not relevant to what the jury must decide: Did the defendant commit the alleged offense? Juries are not instructed to acquit the defendant if the government's investigation was superficial. Conducting a thorough, professional investigation is not an element of the government's case. . . . *A defendant may, however, rely upon relevant deficiencies or lapses in the police investigation to raise the specter of reasonable doubt, and the trial court violates his right to a fair trial by precluding the jury from considering evidence to that effect.* See *Commonwealth* v. *Bowden*, 379 Mass. 472, 485–86, 399 N.E.2d 482 (1980) (trial court improperly instructed jury not to consider evidence of investigators' failure

to perform certain scientific tests when defendant's presentation at trial focused on raising inference that police had contrived much of the case against him and he emphasized that failure in order to call into question the integrity of the police investigation); see also *Commonwealth* v. *Avila*, 454 Mass. 744, 767, 912 N.E.2d 1014 (2009) (a judge may not remove the issue of a biased or faulty police investigation from the jury); *People* v. *Rodriguez*, [141 App. Div. 2d 382, 385, 529 N.Y.S.2d 318 (1988)] (trial court denied defendant fair trial by eliminat[ing] from the jury's consideration an essential element of the defense, namely, police testing that did not yield fingerprints on gun at issue)." (Citations omitted; emphasis added; footnote omitted; internal quotation marks omitted.) *State* v. *Collins*, supra, 299 Conn. 599–600.

On appeal, the defendant in *Collins*, Ricardo Collins, claimed that the last two sentences of the instruction, which substantively was identical to the one given in *Williams*; see footnote 8 of this opinion; "destroyed [his] defense by precluding consideration of it and also by conveying the judge's impression that his defense was not worthy of consideration." (Internal quotation marks omitted.) *State* v. *Collins*, supra, 299 Conn. 598. We disagreed, concluding that "[the] instruction did not mislead the jury or violate [Collins'] right to present a defense because it did not direct the jury *not* to consider the adequacy of the investigation as it related to the strength of the state's case, or *not* to consider specific aspects of [Collins'] theory of the case. Rather, the instruction highlighted the portions of the parties' arguments that addressed the adequacy of the police investigation, and properly reminded the jury that its core task was to determine whether [Collins] was guilty of the charged offenses in light of all the evidence admitted at trial, rather than to evaluate the adequacy of the police investigation in the abstract. . . . Moreover, notwithstanding [Collins'] arguments to the contrary, the . . . instruction was phrased in neutral language and did not improperly disparage [his] claims, or improperly highlight or endorse the state's arguments and evidence." (Citations omitted; emphasis added; footnotes omitted.) Id., 600–602.[17]

In *State* v. *Wright*, supra, 322 Conn. 281, this court revisited the defense of investigative inadequacy, albeit in the context of a claim that the trial court improperly precluded the defendant, Billy Ray Wright, from asking questions during cross-examination about the adequacy of the police investigation in that case.[18] In addressing this claim, we reaffirmed recognition of a defendant's entitlement to present an investigative inadequacy defense, stating in relevant part: "[T]he inference that may be drawn from an inadequate police investigation is that the evidence at trial may be inadequate or unreliable because the police failed to conduct the scientific tests or to pursue leads that a reasonable police investi-

gation would have conducted or investigated, and these tests or investigation reasonably may have led to significant evidence of the defendant's guilt or innocence. A jury may find a reasonable doubt if [it] conclude[s] that the investigation was careless, incomplete, or so focused on the defendant that it ignored leads that may have suggested other culprits." (Internal quotation marks omitted.) Id., 283, citing *Commonwealth* v. *Silva-Santiago*, 453 Mass. 782, 801, 906 N.E.2d 299 (2009).

In light of *Williams*, *Collins* and *Wright*, we agree with the defendant that the model jury instruction utilized by the trial court in the present case failed to inform the jury not only of a defendant's right to "rely upon relevant deficiencies or lapses in the police investigation to raise the specter of reasonable doubt"; *State* v. *Collins*, supra, 299 Conn. 599–600; but also the jury's concomitant right to consider any such deficiencies in evaluating whether the state has proved its case beyond a reasonable doubt.[19] Although the model instruction is similar to the instructions this court approved in *Williams* and *Collins* because it informs the jury not to consider investigative inadequacy "in the abstract"; (internal quotation marks omitted) id., 599; the model instruction, unlike the instructions in *Williams* and *Collins*, improperly fails to inform the jury that a defendant may present evidence of investigative inadequacy in his or her *particular* case. Indeed, as the defendant argues, the model instruction omits the very language that the court in *Collins* determined rendered the instruction in that case acceptable because it (1) apprised the jury that "the defendant was entitled to make an investigation and put his evidence before [it]," and (2) directed the jury to determine, based on "*all the evidence* before [it]," including evidence presented by the defendant, whether the state had proved the defendant's guilt beyond a reasonable doubt. (Emphasis added; internal quotation marks omitted.) Id., 595. The language that the defendant requested be added to the model jury instruction—i.e., that the jury "may consider evidence of the police investigation as it might relate to any weaknesses in the state's case"—would have similarly apprised the jury of the defendant's right to present an investigative inadequacy defense and the jury's right to consider it in evaluating the strength of the state's case.

We further conclude that there is a significant risk that the instruction given by the trial court misled the jury to believe that it could *not* consider the defendant's arguments concerning the adequacy of the police investigation. Although the first sentence of the instruction acknowledged that the defendant made arguments that the police had failed to investigate adequately the crime in question, in the very next sentence, the jury was instructed that the adequacy of the police investigation was *not* for it to decide. This admonishment was reinforced by the third and final sentence that the "*only*" issue for the jury to decide was whether the state had

proven the defendant's guilt beyond a reasonable doubt. (Emphasis added; internal quotation marks omitted.) Thus, rather than apprising the jury that reasonable doubt could be found to exist if the jury "conclude[d] that the investigation was careless, incomplete, or so focused on the defendant that it ignored leads that may have suggested other culprits"; (internal quotation marks omitted) *State* v. *Wright*, supra, 322 Conn. 283; there is a reasonable possibility that the instruction had the opposite effect and caused the jury to believe that it was *prohibited* from considering any such evidence. Cf. *State* v. *Collins*, supra, 299 Conn. 600–601 (instruction "did not direct the jury *not* to consider the adequacy of the investigation as it related to the strength of the state's case, or *not* to consider specific aspects of the defendant's theory of the case" (emphasis added)); see also *Stabb* v. *State*, 423 Md. 454, 472, 31 A.3d 922 (2011) (instruction impermissibly invaded province of jury by effectively directing it not to consider lack of sexual assault forensics examination or corroborating physical evidence); *Atkins* v. *State*, 421 Md. 434, 452–53, 26 A.3d 979 (2011) (concluding that instruction violated defendant's constitutional rights to due process and fair trial because it directed jury to ignore arguments by defendant that state had not presented scientific evidence connecting knife to alleged crime).

Given the relative weakness of the state's case, it also is apparent that the instructional error was harmful to the defendant. As previously indicated, the state's case against the defendant turned almost entirely on the believability of the victim's testimony that, although she had never seen the defendant before the night in question and could not describe him to Officer Topolski when they spoke at the hospital following the assault, and although the attack occurred in "a split second" from behind a six foot fence, she was able to identify the defendant as her assailant from a photographic array conducted more than two weeks later. Defense counsel sought to exploit and amplify the weaknesses in the state's evidence by directing the jury's attention to inadequacies and omissions in the investigation, in particular Officers Topolski's and Goncalves' failure to consider Morais as a potential suspect, even though he was identified as such by the police dispatcher, as well as their failure to interview any of the witnesses who approached them on the night in question outside the club, claiming to have information about the assault. Defense counsel asked the jury to find the defendant not guilty on the basis of these investigative lapses because they raised a reasonable doubt as to the trustworthiness of the victim's identification of him as the person who attacked her. We cannot conclude that a properly instructed jury would not have done so.[20]

The judgment of the Appellate Court is reversed and the case is remanded to that court with direction to reverse the judgment of the trial court and to remand

the case to that court for a new trial.

In this opinion the other justices concurred.

* January 26, 2021, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] This court granted the defendant's petition for certification to appeal, limited to the following issues: (1) "Did the Appellate Court correctly conclude that the trial court's 'investigative inadequacy' jury instruction did not mislead the jury or otherwise prejudice the defendant?" And (2) "[s]hould this court overrule or limit its decisions in *State* v. *Williams*, 169 Conn. 322, 363 A.2d 72 (1975), and *State* v. *Collins*, 299 Conn. 567, 10 A.3d 1005, cert. denied, 565 U.S. 908, 132 S. Ct. 314, 181 L. Ed. 2d 193 (2011), as they relate to the 'investigative inadequacy' jury instruction, and invoke its supervisory authority to prescribe an investigative inadequacy instruction as proposed by the defendant?" *State* v. *Gomes*, 334 Conn. 902, 219 A.3d 798 (2019).

[2] "It is not clear from the record whether the individual that Ayala knew as 'Rafael' was Raphael Morais. Ayala did not know the last name of the individual whom he referred to as Rafael, and the spelling of the name, Raphael or Rafael, is inconsistent throughout the trial transcripts. Nevertheless, both parties concede in their briefs that the defendant and Morais were engaged in some form of altercation." *State* v. *Gomes*, 193 Conn. App. 79, 82 n.5, 218 A.3d 1063 (2019).

[3] "The plastic surgeon who treated the victim testified regarding her injuries. Reading from an emergency department attending physician's note that was in evidence, the plastic surgeon stated: 'The patient sustained a deep laceration in the left eyebrow, and she was struck with a bottle on the face during the fight in the bar. . . . There is a five centimeter in length laceration that's deep with irregular borders and a small stellar portion [over] the left brow . . . .' The plastic surgeon also testified that the 'stellar portion' referred to 'where the skin . . . bursts open from contact where it stellates, so it just looks like a star. . . . It's not a clean laceration, like you get from a kitchen knife.' " *State* v. *Gomes*, 193 Conn. App. 79, 82–83 n.6, 218 A.3d 1063 (2019).

[4] "There was evidence that, after the defendant struck the victim with the bottle, several other patrons of the club attacked Morais." *State* v. *Gomes*, 193 Conn. App. 79, 83 n.7, 218 A.3d 1063 (2019).

[5] "The victim testified that she did not give the defendant's name to the police because she did not know the defendant prior to the night she was attacked." *State* v. *Gomes*, 193 Conn. App. 79, 84 n.8, 218 A.3d 1063 (2019).

[6] Officer Goncalves testified that, in his experience responding to incidents at bars, because of the consumption of alcohol, bystanders tend to volunteer information to the police about their observations, which are often in "blurry" detail. He further testified that the police view this information with skepticism until it can be "confirm[ed]." During closing argument, defense counsel directed the jury's attention to this testimony: "You know what else Officer Goncalves said . . . when he testified about that night? It was interesting. I don't know if you caught it. He said so typically when . . . officers do respond to bar fights, alcohol is involved so people tend to be more vocal and facts tend to be a little blurry. . . . [The police] want to confirm some of the information coming in. Confirm, ladies and gentlemen. The police never confirmed what [the victim] had to say. They never confirmed her story."

[7] Instruction 2.6-14, titled "Adequacy of Police Investigation," was approved by the Judicial Branch's Criminal Jury Instruction Committee on November 6, 2014. It provides: "You have heard some arguments that the police investigation was inadequate and that the police involved in this case were incompetent. The issue for you to decide is not the thoroughness of the investigation or the competence of the police. The only issue you have to determine is whether the state, in light of all the evidence before you, has proved beyond a reasonable doubt the defendant is guilty of the count[s] with which (he/she) is charged." Connecticut Criminal Jury Instructions 2.6-14, available at https://www.jud.ct.gov/JI/Criminal/Criminal.pdf (last visited January 21, 2021).

The commentary to instruction 2.6-14 provides: " 'A defendant may . . . rely upon relevant deficiencies or lapses in the police investigation to raise the specter of reasonable doubt, and the trial court violates his right to a fair trial by precluding the jury from considering evidence to that effect.' *State* v. *Collins*, 299 Conn. 567, 599–600 [10 A.3d 1005] (finding that such an instruction as this does not preclude the jury from considering the evidence of the police investigation as it might relate to any weaknesses in

the state's case) [cert. denied, 565 U.S. 908, 132 S. Ct. 314, 181 L. Ed. 2d 193 (2011)]. '*Collins* does not require a court to instruct the jury on the quality of police investigation, but merely holds that a court may not preclude such evidence and argument from being presented to the jury for its consideration.' *State* v. *Wright*, 149 Conn. App. 758, 773–74, [89 A.3d 458] cert. denied, 312 Conn. 917 [94 A.3d 641] (2014)." Connecticut Criminal Jury Instructions, supra, 2.6-14, commentary.

[8] In *Collins*, the trial court instructed the jury in relevant part: "Now, you have heard in the course of arguments by counsel discussion as to whether the police conducted a thorough investigation. You have also heard some discussion about the competency of the police in this arrest. Ladies and gentlemen, this question might be a matter of opinion, but the state has put its evidence before you and the defendant was entitled to make an investigation and put his evidence before you also. And, of course, not only the state but also the defense has put on evidence on behalf of the defendant. I say to you, ladies and gentlemen, that the ultimate issue before you is not the thoroughness of the investigation or the competence of the police. The ultimate issue you have to . . . determine is whether the state in light of all the evidence before you has proved beyond a reasonable doubt that the defendant is guilty on one or more of the counts for which he is charged." (Emphasis omitted; internal quotation marks omitted.) *State* v. *Collins*, supra, 299 Conn. 595.

[9] In *Williams*, the trial court instructed the jury in relevant part: "Now, you have heard in the course of arguments discussion as to whether the police conducted a thorough search. You have also heard some discussion about the competency of the police in this arrest. Now, ladies and gentlemen, this question might be a matter of opinion, but the [s]tate has put its evidence before you, and the defense was entitled to make an investigation and put its evidence before you also, and, of course, not only the [s]tate but also the defense has put on evidence on behalf of the defendant. I say to you, ladies and gentlemen, that the issue before you is not the thoroughness of the investigation or the competence of the police. This issue you have to determine is whether the [s]tate in the light of all the evidence before you has proved beyond a reasonable doubt that the defendant is guilty on one or both counts with which he is charged." (Internal quotation marks omitted.) *State* v. *Williams*, supra, 169 Conn. 335 n.3.

[10] In *Nieves*, the trial court instructed the jury in relevant part: "During the course of the case, you've heard some discussion or questioning as to whether the police conducted a thorough investigation and the competency of the police in this case. The issue before you in this case is not the thoroughness of the investigation or the competence of the police. The issue you have to determine is whether the state, in light of the evidence before you, has proven beyond a reasonable doubt [that] the defendant is guilty of the crimes charged." (Internal quotation marks omitted.) *State* v. *Nieves*, supra, 106 Conn. App. 57.

[11] In *Tate*, the trial court instructed the jury in relevant part: "You've heard questioning regarding the thoroughness of the police investigation in this case. This question might be a matter of opinion, but the state has put its evidence before you, and the defense is entitled to make an investigation and put its evidence before you also. And, of course, not only the state but also the defense has put on evidence in behalf of the defendant. I tell you that the issue before you is not the thoroughness of the investigation of the responding police officer; the issue you have to determine is whether the state, in light of all the evidence before you, has proved the defendant's guilt beyond a reasonable doubt as I have recited that to you. That is the sole issue." (Internal quotation marks omitted.) *State* v. *Tate*, supra, 59 Conn. App. 284.

[12] Although the basis for the defendant's deportation is unknown, we take judicial notice of the fact that, in 2011, the defendant pleaded guilty in the Superior Court, judicial district of Fairfield, to possession of narcotics in violation of General Statutes § 21a-279 (a), specifically, for possession of cocaine. See *Bouchard* v. *State Employees Retirement Commission*, 328 Conn. 345, 371 n.13, 178 A.3d 1023 (2018) ("[this] court may take judicial notice of files in other cases"). The defendant's conviction of possession of cocaine, which is not challenged in this appeal, renders him permanently inadmissible to the United States because it is a "controlled substance" violation. See 8 U.S.C. § 1182 (a) (2) (A) (i) (2018) ("any alien convicted of . . . (II) a violation of . . . any law or regulation of a State . . . relating to a controlled substance (as defined in section 802 of Title 21), is inadmissible"); 21 U.S.C. § 802 (6) (2018) ("[t]he term 'controlled substance' means

a drug or other substance, or immediate precursor, included in schedule I, II, III, IV, or V of part B of this subchapter"); 21 U.S.C. § 812, schedule II (a) (4) (2018) ("coca leaves . . . cocaine . . . or any compound, mixture, or preparation which contains any quantity of any of the substances referred to in this paragraph"); cf. 8 U.S.C. § 1182 (h) (2018) ("[t]he Attorney General may, in his discretion, waive the application of . . . subparagraph (A) (i) (II) of such subsection insofar as it relates to single offense of simple possession of 30 grams or less of marijuana"). For the reasons provided herein, the defendant's permanent inadmissibility to the United States does not alter our conclusion that we may provide him with practical relief by ruling in his favor on the merits of the appeal.

[13] "[M]ootness implicates [this] court's subject matter jurisdiction and is thus a threshold matter for us to resolve." (Internal quotation marks omitted.) *State* v. *McElveen*, 261 Conn. 198, 204, 802 A.2d 74 (2002), quoting *Ayala* v. *Smith*, 236 Conn. 89, 93, 671 A.2d 345 (1996).

[14] We do not find *Perez* particularly persuasive in any event because, in concluding that no collateral consequences could arise from the robbery conviction of the petitioner, Santos Perez, due to his permanent inadmissibility stemming from an unrelated drug conviction, the Second Circuit Court of Appeals failed to consider Perez' eligibility for a temporary admission waiver under 8 U.S.C. § 1182 (d) (3). See *United States* v. *Hamdi*, 432 F.3d 115, 120–21 (2d Cir. 2005) (concluding that defendant's appeal from sentence enhancement imposed following his guilty plea was not moot, despite his removal and inadmissibility due to unchallenged conviction, because enhanced sentence could impact his ability to obtain discretionary waiver under 8 U.S.C. § 1182 (d) (3)). A waiver under 8 U.S.C. § 1182 (d) (3) "waives nearly every ground of inadmissibility set forth in [8 U.S.C. § 1182 (a)] for nonimmigrant applicants," except "security related grounds such as espionage, sabotage, persecution, genocide, or torture . . . ." D. Beach, "Waivers of Inadmissibility: Off the Beaten Path," 11-01 Immigr. Briefings 1 (January, 2011). Perez was inadmissible because of a prior controlled substance conviction; *Perez* v. *Greiner*, supra, 296 F.3d 126; but that would not have rendered him ineligible for a waiver under 8 U.S.C. § 1182 (d) (3).

According to the United States Department of State's Foreign Affairs Manual, "[t]he law does not require that such waiver action be limited to exceptional, humanitarian or national interest cases. Thus, while the exercise of discretion and good judgment is essential, generally, consular officers may recommend waivers for any legitimate purpose such as family visits, medical treatment (whether or not available abroad), business conferences, tourism, etc." (Internal quotation marks omitted.) D. Beach, supra, 11-01 Immigr. Briefings 1. Similarly, the Board of Immigration Appeals has stated that there is "no requirement that the applicant's reasons for wishing to enter the United States be 'compelling.' " *In re Hranka*, 16 I. & N. Dec. 491, 492 (B.I.A. 1978). In determining whether to grant a waiver, three factors must be weighed: "The first is the risk of harm to society if the applicant is admitted. *The second is the seriousness of the applicant's prior immigration law, or criminal law, violations, if any.* The third factor is the nature of the applicant's reasons for wishing to enter the United States." (Emphasis added.) Id. Additional considerations include the "*recentness and seriousness of the crime or offense*, type of disability, reasons for proposed travel to the United States, and the probable consequences of the public interest of the [United States]." (Emphasis added.) D. Beach, supra, 11-01 Immigr. Briefings 1.

Accordingly, in *Perez*, Perez' unchallenged controlled substance conviction did not necessarily render him ineligible for a discretionary waiver under 8 U.S.C. § 1182 (d) (3). If the robbery conviction he challenged in his appeal was upheld, however, that conviction may have weighed against his receiving such a waiver. See *United States* v. *Hamdi*, supra, 432 F.3d 120–21. Because "a habeas petition challenging a criminal conviction is rendered moot by a release from imprisonment only if it is shown that there is no possibility that any collateral legal consequences will be imposed on the basis of the challenged conviction"; (internal quotation marks omitted) *Perez* v. *Greiner*, supra, 296 F.3d 125; the potential that Perez' challenged robbery conviction might have adversely impacted his eligibility for a discretionary waiver under 8 U.S.C. § 1182 (d) (3) provided a sufficient basis to avoid the dismissal of his appeal as moot. Because the court in *Perez* failed to consider the relevance of a discretionary waiver under 8 U.S.C. § 1182 (d) (3), for which the defendant in this appeal might be eligible, we do not find its analysis persuasive.

[15] It appears, however, that, in the civil law context, reputational injury

is considered by some federal courts to be a sufficiently prejudicial collateral consequence to prevent dismissal on mootness grounds. See, e.g., *Furline* v. *Blakey*, 246 Fed. Appx. 813, 815 (3d Cir. 2007) (appeal of airman whose airman's certificate was suspended for 180 days, then reinstated, was not moot because of possible collateral consequence of "continuing stigma"); *In re Surrick*, 338 F.3d 224, 230 (3d Cir. 2003) (attorney's suspension from practice of law was not moot because continuing stigma associated with suspension constituted possible collateral consequence), cert. denied, 540 U.S. 1219, 124 S. Ct. 1509, 158 L. Ed. 2d 154 (2004); *Dailey* v. *Vought Aircraft Co.*, 141 F.3d 224, 228 (5th Cir.1998) (appeal of attorney who was disbarred and then reinstated was not moot because even temporary disbarment is harmful to lawyer's reputation, and "the mere possibility of adverse collateral consequences is sufficient to preclude a finding of mootness" (internal quotation marks omitted)); *Connell* v. *Shoemaker*, 555 F.2d, 483, 486–87 (5th Cir. 1977) (appeal by apartment owners seeking relief from military official's order prohibiting military personnel from renting owners' properties for 180 days was not moot after 180 day period because of harm to owners' reputations).

[16] Morais did not testify at trial. According to testimony from Richard Lindberg, an inspector at the Office of the State's Attorney, the state attempted to serve a subpoena on Morais but was unsuccessful in locating him.

[17] Following *Collins*, the model criminal jury instruction titled "Adequacy of Police Investigations" was approved by the Judicial Branch's Criminal Jury Instruction Committee. See footnote 7 of this opinion.

[18] In *Wright*, this court did not consider the propriety of an investigative inadequacy instruction because the trial court had prevented Wright from presenting evidence of investigative inadequacy that would warrant such an instruction. Rather, this court determined what evidentiary thresholds a defendant must satisfy before pursuing an investigative inadequacy defense. *State* v. *Wright*, supra, 322 Conn. 284–85 (defendant must establish relevance of testimony offered, and trial court must determine whether probative value of evidence exceeds risk of unfair prejudice to state).

[19] "The language used in the model jury instructions, although instructive in considering the adequacy of a jury instruction . . . is not binding on this court." (Citation omitted; internal quotation marks omitted.) *Snell* v. *Norwalk Yellow Cab, Inc.*, 332 Conn. 720, 762, 212 A.3d 646 (2019). "[W]e previously have cautioned that the . . . jury instructions found on the Judicial Branch website are intended as a guide only, and that their publication is no guarantee of their adequacy. See, e.g., *State* v. *Reyes*, 325 Conn. 815, 821–22 n.3, 160 A.3d 323 (2017) (The Judicial Branch website expressly cautions that the jury instructions contained therein [are] intended as a guide for judges and attorneys in constructing charges and requests to charge. The use of these instructions is entirely discretionary and their publication by the Judicial Branch is not a guarantee of their legal sufficiency. . . .)." (Internal quotation marks omitted.) *Snell* v. *Norwalk Yellow Cab, Inc.*, supra, 762–63.

[20] We agree with the defendant that the investigative inadequacy instruction upheld in *Williams* and *Collins* should be improved on to better convey, as this court recently explained in *Wright*, that "[t]he inference that may be drawn from an inadequate police investigation is that the evidence at trial may be inadequate or unreliable because the police failed to conduct the scientific tests or to pursue leads that a reasonable police investigation would have conducted or investigated, and these tests or investigation reasonably may have led to significant evidence of the defendant's guilt or innocence. A jury may find a reasonable doubt if [it] conclude[s] that the investigation was careless, incomplete, or so focused on the defendant that it ignored leads that may have suggested other culprits." (Internal quotation marks omitted.) *State* v. *Wright*, supra, 322 Conn. 283. Toward that end, we encourage our trial courts going forward to utilize the following investigative inadequacy instruction, which bears resemblance to the one utilized by the Massachusetts courts: You have heard some testimony of witnesses and arguments by counsel that the state did not (mention alleged investigative failure: e.g., conduct certain scientific tests, follow standard procedure, perform a thorough and impartial police investigation, etc.) in this case. This is a factor that you may consider in deciding whether the state has met its burden of proof in this case because the defendant may rely on relevant deficiencies or lapses in the police investigation to raise reasonable doubt. Specifically, you may consider whether (relevant police investigative action) would normally be taken under the circumstances, whether, if (that/

those) action(s) (was/were) taken, (it/they) could reasonably have been expected to lead to significant evidence of the defendant's guilt or innocence, and whether there are reasonable explanations for the omission of (that/those) action(s). If you find that any omissions in the investigation were significant and not reasonably explained, you may consider whether the omissions tend to affect the quality, reliability, or credibility of the evidence presented by the state to prove beyond a reasonable doubt that the defendant is guilty of the count(s) with which (he/she) is charged. The ultimate issue for you to decide, however, is whether the state, in light of all of the evidence before you, has proved beyond a reasonable doubt that the defendant is guilty of the count(s) with which (he/she) is charged. See, e.g., Criminal Model Jury Instructions for Use in the District Court, Instruction 3.740, available at https://www.mass.gov/doc/3740-omissions-in-police-investigations/download (last visited January 21, 2021).

———————————————————