# ROMAN VILLANUEVA
## (SC 20869)

Mullins, C. J., and McDonald, D'Auria, Ecker,
Alexander, Dannehy and Bright, Js.

*Syllabus*

Convicted of murder, carrying a pistol without a permit, and criminal posses-
sion of a firearm in connection with the shooting death of the victim, the
defendant appealed to this court. The defendant claimed that the trial court
had deprived him of his constitutional right to present a defense by declining
to instruct the jury on the adequacy of the police investigation into the
victim's murder. He also claimed that the trial court had violated his right
to due process under the state constitution by admitting into evidence an
out-of-court identification of him by B, an eyewitness to the shooting, and
his constitutional right to confrontation by admitting certain testimony of
a medical examiner, N, who did not personally perform the victim's
autopsy. *Held*:

There was no merit to the defendant's claim that he was deprived of his
right to present a defense when the trial court declined to instruct the jury
that it could consider inadequacies in the investigation of the victim's murder
by the police.

To the extent that the defendant's investigative inadequacy claim was prem-
ised on the contention that the investigation by the officers responding to

State *v.* Villanueva

the crime scene resulted in certain lapses, this court declined to review that portion of the defendant's claim because defense counsel did not raise it in the trial court.

Moreover, as to the portion of the defendant's investigative inadequacy claim regarding the failure of the police to investigate another individual as an alternative suspect and to perform a victimology, there was no evidence in the record to support these contentions.

The trial court did not violate the defendant's state constitutional right to due process by denying the defendant's motion to preclude B's out-of-court identification of the defendant.

The defendant could not prevail on his claim that the identification procedure employed by the police was suggestive and that the resulting identification was unreliable on the ground that, one week before a police officer administered the photographic array, another police officer had allegedly pressured B to identify someone or face possible prosecution for the victim's murder, as B provided uncontroverted testimony at trial that the officer administering the photographic array reassured her that it was fine if she did not identify anyone from the array and that she did not select the defendant's photograph due to coercion or the potential threat of prosecution.

Furthermore, the failure of the police officer administering the identification procedure to instruct B, in accordance with the statute (§ 54-1p) mandating certain procedures for lineups and photographic arrays, that the investigation would continue regardless of whether B identified someone did not render the identification procedure suggestive, as the other required instructions, including warnings that the perpetrator was not necessarily among those pictured in the array and that B should not feel obligated to identify someone, were provided, there was no evidence that B actually believed that the investigation would not continue if she failed to identify a suspect, and the array otherwise constituted a properly conducted, double-blind sequential identification procedure.

The trial court did not violate the defendant's sixth amendment right to confrontation by allowing N to testify regarding the victim's injuries and cause of death, even though N did not personally perform the victim's autopsy.

To the extent that the defendant's claim was based on his contention that a certain autopsy photograph admitted into evidence communicated the apparent conclusions of W, the medical examiner who conducted the autopsy and that N's testimony interpreting that photograph violated his right to confront W, the confrontation clause bars only the introduction of hearsay, and this court concluded that the autopsy photograph itself was not hearsay and that N's testimony about the victim's wounds as depicted in the photograph was based solely on her review and interpretation of the

State *v.* Villanueva

photograph rather than on the findings and conclusions W included in the autopsy report.

Moreover, even if some of N's other testimony regarding the autopsy and the victim's injuries constituted improperly admitted testimonial hearsay, the error was harmless beyond a reasonable doubt, as the improperly admitted evidence could not have affected the verdict because there was no dispute regarding the cause of the victim's death and the evidence of the defendant's guilt was overwhelming.

Argued April 16—officially released July 15, 2025

*Procedural History*

Substitute information charging the defendant with the crimes of murder, carrying a pistol without a permit, and criminal possession of a weapon, brought to the Superior Court in the district of New Haven, where the court, *Alander, J.*, denied the defendant's motion to preclude a witness' out-of-court identification; thereafter, the charges of murder and carrying a pistol without a permit were tried to the jury before *Alander, J.*; verdict of guilty; subsequently, the charge of criminal possession of a weapon was tried to the court, *Alander, J.*; finding of guilty; thereafter, the court, *Alander, J.*, rendered judgment in accordance with the verdict and the finding, from which the defendant appealed to this court. *Affirmed.*

*Denis J. O'Malley III*, assistant public defender, for the appellant (defendant).

*Laurie N. Feldman*, assistant state's attorney, with whom were *Melissa R. Holmes*, deputy assistant state's attorney, and, on the brief, *John P. Doyle*, state's attorney, and *Seth R. Garbarsky*, senior assistant state's attorney, for the appellee (state).

*Opinion*

DANNEHY, J. The defendant, Davis Roman Villanueva, appeals[1] from the judgment of conviction, ren-

_____

[1] The defendant appealed directly to this court pursuant to General Statutes § 51-199 (b) (3).

State *v.* Villanueva

dered after a jury trial, of murder in violation of General Statutes § 53a-54a (a), carrying a pistol without a permit in violation of General Statutes (Rev. to 2019) § 29-35 (a), and criminal possession of a firearm in violation of General Statutes (Rev. to 2019) § 53a-217 (a) (1). The defendant claims that the trial court (1) deprived him of his right to present a defense by refusing to instruct the jury on investigative inadequacy, (2) violated his right to due process under the state constitution by admitting a witness' out-of-court identification of him, and (3) violated his right of confrontation under the sixth amendment to the United States constitution by admitting the testimony of a medical examiner who did not personally perform the autopsy on the victim, Casey Schoonover. We affirm the judgment of the trial court.

The following facts, which the jury reasonably could have found, and procedural history are relevant to our resolution of this appeal. In the early morning hours of October 4, 2020, the defendant shot and killed the victim outside Mr. Bentley's Café on Grove Street in Meriden. The entire incident was captured by various video surveillance cameras connected to the café. At approximately 12 a.m. that morning, Diana Baez, an eyewitness to the shooting, had gone with her siblings and brother-in-law to a private, after-hours club located on the second floor of the café. There, she interacted with the defendant but never exchanged names with him. At approximately 4 a.m., Baez and her family decided to go to an all-night diner and invited the defendant to accompany them. As the group was leaving the club, they ran into a former boyfriend of Baez' sister, Ramphis Pacheco, who was extremely intoxicated and acting belligerent. For his own good, the family convinced Pacheco to leave with them.

The victim arrived at the club just as Baez' group was leaving. At the door, Pacheco threw his arm around the victim and started hassling him. The victim told

State *v.* Villanueva

Pacheco to leave him alone and go home. In response, the defendant threw a beer can at the victim and charged at him. Baez and her siblings pulled the defendant off the victim, after which the defendant ran to his red pickup truck, which was parked in an empty lot next to the café. When he got there, he retrieved something from inside the truck. As he was doing this, Baez walked up behind him, and they began talking. Within seconds, the victim appeared and started walking diagonally across the lot in the direction of Foster Court, a no outlet road where he had left his car. Foster Court runs parallel to Grove Street along the west side of the lot where the defendant's truck was parked. Footage from the café's surveillance cameras shows that, when the defendant saw the victim, he ran toward him, struck him forcefully on the head and then shot him twice. The footage also shows the victim's body jerk violently after the first shot was fired, at which point Baez and her brother-in-law tried to intervene on the victim's behalf. After shooting the victim, the defendant jumped into his truck and sped away. Baez did not see a gun in the defendant's hand until after the shooting, although she did see a muzzle flash when the weapon discharged. The victim ran away after the shooting, which led Baez to assume he was uninjured. In fact, one of the bullets severed a major artery in his abdomen.

Meriden Police Officer Zackary Golebiewski arrived at the scene seconds after the shooting. Golebiewski heard two gunshots from where he was parked a short distance away and saw the defendant's red truck speeding away. Just as he heard the gunshots, Golebiewski saw Pacheco cross Grove Street and walk toward Union Street. He then saw Pacheco's grey Chevrolet Malibu turn south on Grove Street and then take an immediate right on Springdale Avenue. Golebiewski advised police dispatch of what was happening at the café and then proceeded to search for the defendant's red truck. While

State *v.* Villanueva

enroute, Golebiewski pulled alongside Baez' family and asked whether they too had heard gunshots and whether the red truck was involved in the shooting. They responded falsely that the shots had come from an area west of the café and that the driver of the truck was not involved. Golebiewski searched for the red truck for several minutes and then returned to the café. By then, other officers were on the scene searching for evidence of a shooting. A few minutes later, Golebiewski was summoned to a traffic stop, where another officer, while enroute to the café, had stopped Pacheco's Chevrolet Malibu. Golebiewski identified Pacheco's vehicle as the grey sedan he had seen driving on Grove Street immediately after the shooting. Pacheco was briefly questioned and allowed to leave. No witness reported hearing any other gunshots in the vicinity of the café apart from the two gunshots fired from the defendant's gun.

With the help of a phone locator application, the victim's girlfriend found the victim's body three hours later, lying next to his car on Foster Court, about forty feet from where the defendant had shot him. Because the victim's gunshot wounds were not immediately incapacitating, he would have been able to walk or run for one or two minutes before succumbing to his injuries.

Four days later, on October 8, 2020, two Meriden police detectives visited Baez at her Manchester apartment, having identified her from the café's surveillance video footage. During the interview, they told Baez that she could be charged with conspiracy to commit murder or hindering if she did not reveal the name of the person who shot the victim. Baez told them that she had never met the shooter prior to the night in question, that they had not exchanged names that evening, and that, if she had known that the victim had been shot, she would have summoned help immediately.

State *v.* Villanueva

As part of their investigation, the police collected several beer cans from near the café's entrance, where the shooter was seen on the surveillance video footage throwing a can of beer at the victim. A DNA mixture collected from one of the cans included the defendant's DNA, with a profile 100 billion times more likely to occur if it originated from the defendant and an unknown individual than from two unknown individuals.

Within days of the murder, Lieutenant Noel Perez Crespo, a twenty-eight year veteran of the Puerto Rico police who had known the defendant his entire life, received a tip from an informant that the defendant had murdered a man in Meriden. Meriden police sent Crespo a still photograph of the defendant taken from the surveillance footage. Crespo identified the defendant immediately from that photograph.

A few days later, Baez identified the defendant through a double-blind, sequential photographic array procedure conducted by an officer from the Manchester Police Department. After the identification, Baez informed the officer that she was not 100 percent certain that the person she identified was the person who shot the victim because the shooter was wearing eyeglasses on the night in question, whereas none of the men in the photographic array was wearing glasses. The defendant was subsequently arrested in Puerto Rico and extradited to Connecticut to stand trial for the victim's murder. At trial, Baez did not identify the defendant. When asked whether the person in the surveillance footage and whom she had identified in the photographic array was present in the court room, Baez replied, "[n]o."[2]

During closing arguments, defense counsel argued, among other things, that the surveillance footage caused the Meriden police to experience tunnel vision to such a degree that they did not consider the possibility that

---

[2] Crespo testified at trial that the defendant was heavier at the time of trial and had longer hair than he had at the time of the murder.

State *v.* Villanueva

Pacheco was the actual killer. Counsel reminded the jury that, according to Baez, the victim ran away after the shooting, meaning it was possible that he had not been shot. Counsel further argued that, according to Golebiewski and the surveillance footage, Pacheco drove his car around the block after leaving the café, which meant he could have shot the victim when he passed by Foster Court. As for the DNA evidence, counsel argued that there was no way of knowing when it was left by the defendant and, therefore, that it did not prove that the defendant was present at the café on the night in question.

I

The defendant first claims that the trial court deprived him of his right to present a defense by declining to instruct the jury that it could consider inadequacies in the police investigation in determining whether the state had proven his guilt beyond a reasonable doubt. We disagree.

The following additional facts are relevant to this claim. Near the end of the trial, the court, *Alander, J.*, conducted a charging conference at which defense counsel requested that the court provide the jury with an investigative inadequacy instruction. Counsel requested the instruction "on the theory that . . . there were multiple failures" in the police investigation. The court asked defense counsel if she could be more specific as to the nature of the alleged failures. Counsel replied that there was a failure to inspect the victim's cell phone. When the court responded that, according to the testimony, the victim's phone was sent to the Federal Bureau of Investigation for forensic analysis, defense counsel argued that the prosecutor should have presented evidence concerning the results of that analysis. She further stated, "I'm not sure that we necessarily need to specifically identify the cell phone, but I think it's a . . . broader question of whether or not the police failed to inspect

State *v.* Villanueva

the . . . evidence that was seized.'' The trial court
replied, ''[w]ell, there needs to be some evidence that
they didn't . . . evaluate evidence that was seized.
Right? I mean, there needs to be some evidence of an
inadequate investigation before I can give the charge.
So, that's what I'm trying to understand. What evidence
is there that you're claiming in this case . . . arguably
. . . shows an inadequate investigation?'' Defense
counsel responded that there was testimony that, ''in
. . . due course, they would have done a victimology
[which is a study that] . . . look[s] into the victim . . .
[to determine] whether or not he had a criminal history,
whether or not he had any enemies on the street. And
. . . there was no evidence that [this] was done in this
case.'' She further argued that there was no evidence
that the police investigated alternative suspects.

At this point, the prosecutor interjected that there
was ''no evidence at all that [any of this] wasn't done,''
that, in fact, all of it had been done, and that, in order
to instruct the jury on investigative inadequacy, there
must be evidence of a specific investigative lapse or a
failure on the part of the police. The prosecutor further
argued that the defense had every opportunity at trial to
adduce evidence that the state had failed to investigate
other suspects, perform a victimology, or examine the
victim's cell phone, but failed to do so. Defense counsel
responded that it was not the defendant's burden ''to
prove or disprove anything'' and that it was incumbent
on the state to present evidence that the police per-
formed an adequate investigation. The court then
stated: ''[Just] because they charged [the defendant]
doesn't mean they didn't investigate other people. I
mean, so is it your claim that the state has to present
witnesses that say not only did we look at [the defen-
dant], we [also] looked at [other suspects] . . . and
then if they don't do that, you can argue that the investi-
gation was inadequate?'' When defense counsel answered

State *v.* Villanueva

that this was the defendant's claim, the trial court stated: "Here's the problem. The form jury instruction on adequacy [of the] police investigation, the first sentence is 'you have heard some testimony of witnesses and arguments by counsel that the state did not [do] X.' I don't have any . . . evidence that I remember in this case from a witness that the state did not do X or failed to do Y. That's the problem. And so, for that reason, I decline to give the . . . instruction on [the] adequacy of [the] police investigation."[3]

The following legal principles guide our analysis of this claim. "In determining whether the trial court improperly refused a request to charge, [w]e . . . review the evidence presented at trial in the light most favorable to supporting the . . . proposed charge. . . . A request to charge [that] is relevant to the issues of [a] case and [that] is an accurate statement of the law must be given. . . . If, however, the evidence would not rea-

---

[3] Instruction 2.6-13 of the Connecticut Criminal Jury Instructions, entitled "Adequacy of Police Investigation," provides: "You have heard some testimony of witnesses and arguments by counsel that the state did not *<insert alleged investigative failure(s): e.g., conduct scientific tests, perform a thorough and impartial investigation, follow standard procedure, etc.>*. This is a factor that you may consider in deciding whether the state has met its burden of proof in this case because the defendant may rely on relevant deficiencies or lapses in the police investigation to raise reasonable doubt. Specifically, you may consider whether *<insert evidence of alleged police deficiencies or lapses>* would normally be taken under the circumstances, whether if (that/these) action(s) (was/were) taken, (it/they) could reasonably have been expected to lead to significant evidence of the defendant's guilt or evidence creating a reasonable doubt of his guilt, and whether there are reasonable explanations for the omission of (that/those) actions. If you find that any omissions in the investigation were significant and not reasonably explained, you may consider whether the omissions tend to affect the quality, reliability, or credibility of the evidence presented by the state to prove beyond a reasonable doubt that the defendant is guilty of the count(s) with which (he/she) is charged in the information. The ultimate issue for you to decide, however, is whether the state, in light of all the evidence before you, has proved beyond a reasonable doubt that the defendant is guilty of the count(s) with which (he/she) is charged." Connecticut Criminal Jury Instructions 2.6-13, available at https://jud.ct.gov/JI/Criminal/Criminal.pdf (last visited July 9, 2025).

State *v.* Villanueva

sonably support a finding of the particular issue, the trial court has a duty not to submit it to the jury. . . . Thus, a trial court should instruct the jury in accordance with a party's request to charge [only] if the proposed instructions are reasonably supported by the evidence.'' (Internal quotation marks omitted.) *State* v. *Ashby*, 336 Conn. 452, 497–98, 247 A.3d 521 (2020).

"As a general rule, a defendant is entitled to have instructions on a defense for which there is evidence produced at trial to justify the instruction, no matter how weak or incredible the claim.'' *State* v. *Varszegi*, 236 Conn. 266, 282, 673 A.2d 90 (1996). Thus, "[i]f [a] defendant asserts a recognized legal defense and the evidence indicates the availability of that defense, such a charge is obligatory and the defendant is entitled, as a matter of law, to a theory of defense instruction. . . . The defendant's right to such an instruction is founded on the principles of due process. . . . Before an instruction is warranted, however, [a] defendant bears the initial burden of producing sufficient evidence to inject [the defense] into the case.'' (Internal quotation marks omitted.) *State* v. *Lynch*, 287 Conn. 464, 470–71, 948 A.2d 1026 (2008).

On appeal, the defendant argues that the trial court incorrectly concluded that the evidence was insufficient to warrant an investigative inadequacy instruction. He contends that a defendant is entitled to a theory of defense instruction no matter how weak or incredible the evidence supporting it may be and that the evidence in the present case "more than satisfied'' this low threshold. In particular, the defendant claims that the following evidence warranted the instruction: (1) Golebiewski chose to pursue the red pickup truck rather than interview witnesses, namely, Baez and her family, "even though he 'did not know what direction the truck went in,' '' (2) those same witnesses "told him they heard gunshots [coming] from the west,'' which was the direc-

State *v.* Villanueva

tion of Foster Court, and yet he and his fellow officers limited their search to the parking lot next to the café, (3) despite stopping Pacheco's vehicle shortly after the shooting, "the police failed to investigate [him] as a suspect," and (4) no witness testified that a victimology was performed, even though a Meriden police officer testified that a victimology is " 'very important' " in homicide investigations.

As the state argues, and our review of the record confirms, the defendant did not claim in the trial court that investigative lapses on the part of Golebiewski— or any of the other responding officers—supported an investigative inadequacy instruction. Counsel argued that the instruction was warranted on the theory that the police had failed to inspect the victim's cell phone, perform a victimology, and investigate other suspects. As a result, the trial court was not on notice that the defendant was seeking the instruction on the basis of any investigative error on the part of the responding officers. Because the claim was not raised in the trial court, we decline to review it on appeal.[4]

As for the defendant's remaining contentions relating to his investigative inadequacy claim, a review of the record reveals no evidence that the police had failed to investigate Pacheco as an alternative suspect or perform a victimology. Indeed, when asked by the trial court if she could identify any evidence supporting either contention, defense counsel was unable to do so. Instead, she argued that the defendant was not required to present evidence of specific investigative lapses, that it was the state's burden to prove that the police con-

---

[4] See, e.g., *State* v. *Ortega*, 345 Conn. 220, 255, 284 A.3d 1 (2022) ("[f]or this court to . . . consider [a] claim on the basis of a specific legal ground not raised during trial would amount to trial by ambuscade, unfair both to the [court] and to the opposing party" (internal quotation marks omitted)); *Diaz* v. *Commissioner of Correction*, 335 Conn. 53, 58, 225 A.3d 953 (2020) ("[o]nly in [the] most exceptional circumstances can and will this court consider a claim, constitutional or otherwise, that has not been raised and decided in the trial court" (internal quotation marks omitted)).

State *v.* Villanueva

ducted an adequate investigation, and that the jury could infer an inadequate investigation from the absence of evidence indicating differently. Suffice it to say, the trial court properly rejected these contentions as contrary to settled principles of law. See, e.g., *State* v. *Gomes*, 337 Conn. 826, 851, 256 A.3d 131 (2021) ("[c]onducting a thorough, professional investigation is not an element of the government's case" (internal quotation marks omitted)); see also *State* v. *Terwilliger*, 294 Conn. 399, 409, 984 A.2d 721 (2009) (defendant must produce evidence to justify theory of defense instruction); *State* v. *Singh*, 259 Conn. 693, 701, 793 A.2d 226 (2002) ("[counsel may not] comment [on], or . . . suggest an inference from, facts not in evidence" (internal quotation marks omitted)); *State* v. *Copas*, 252 Conn. 318, 338–39, 746 A.2d 761 (2000) (inferences drawn by jury must be founded on evidence and not on conjecture). In light of the foregoing, the defendant cannot prevail on his claim that the trial court improperly declined to instruct the jury on investigative inadequacy.[5]

II

The defendant next claims that the trial court violated his state constitutional right to due process by denying

_____

[5] Contrary to the defendant's assertions, this case bears no resemblance to *State* v. *Gomes*, supra, 337 Conn. 826, in which the trial court instructed the jury on investigative inadequacy on the basis of evidence suggesting a number of investigative lapses on the part of the police. Id., 832–33. In *Gomes*, the victim was struck on the head with a bottle while standing on the patio of a crowded bar. Id., 829. "At trial, the [defense] sought to persuade the jury that reasonable doubt existed regarding the victim's identification of the defendant as the person who assaulted her." (Internal quotation marks omitted.) Id., 832. Specifically, defense counsel argued "that the victim had misidentified him . . . either mistakenly or intentionally to protect . . . the actual assailant [who had been at the club attending the same party as the victim], and that, if the police had conducted even a minimally adequate investigation, they would have realized this to be the case." Id., 847. In support of this contention, defense counsel adduced the testimony of various witnesses, including the club owner, who testified that the alleged assailant "was beaten up by a group of club patrons immediately after the victim sustained her injuries." Id., 848. Counsel also elicited testimony from the responding officers that, although they were informed by the police dis-

State *v.* Villanueva

his motion in limine to preclude Baez' out-of-court iden-
tification of him. The defendant argues that the identifi-
cation was the product of an unnecessarily suggestive
identification procedure because the Manchester police
officer who administered it failed to instruct Baez, in
accordance with General Statutes § 54-1p (c) (3) (G),[6]

patcher that the 911 caller had identified the alleged assailant as the attacker,
neither officer ever investigated him as a suspect. Id. The officers also
acknowledged that they were approached at the scene by several club
patrons claiming to have information about the assault, but they never
attempted to interview any of them regarding what they had seen. Id. During
closing arguments, "[d]efense counsel asked the jury to find the defendant
not guilty on the basis of these investigative lapses because they raised a
reasonable doubt as to the trustworthiness of the victim's identification of
him as the person who attacked her." Id., 856. In the present case, however,
in stark contrast to *Gomes*, the record reflects no evidence, and the defendant
was unable to identify any evidence at trial, that supported his requested
investigative inadequacy instruction. Consequently, the trial court properly
declined to give that instruction.

[6] General Statutes § 54-1p (c) provides in relevant part: "(1) Whenever a
specific person is suspected as the perpetrator of an offense, the photographs
included in a photo lineup . . . shall be presented sequentially so that the
eyewitness views one photograph . . . at a time in accordance with the
policies and guidelines developed and promulgated by the Police Officer
Standards and Training Council and the Division of State Police within
the Department of Emergency Services and Public Protection pursuant to
subsection (b) of this section;

"(2) The identification procedure shall be conducted in such a manner
that the person conducting the procedure does not know which person in
the photo lineup . . . is suspected as the perpetrator of the offense, except
that, if it is not practicable to conduct a photo lineup in such a manner, the
photo lineup shall be conducted by the use of a folder shuffle method,
computer program or other comparable method so that the person conduct-
ing the procedure does not know which photograph the eyewitness is view-
ing during the procedure;

"(3) The eyewitness shall be instructed prior to the identification pro-
cedure:

"(A) That the eyewitness will be asked to view an array of photographs
. . . and that each photograph . . . will be presented one at a time;

"(B) That it is as important to exclude innocent persons as it is to identify
the perpetrator;

"(C) That the persons in a photo lineup . . . may not look exactly as
they did on the date of the offense because features like facial or head hair
can change;

"(D) That the perpetrator may or may not be among the persons in the
photo lineup . . .

State *v.* Villanueva

that the police would continue to investigate the victim's murder regardless of whether Baez identified someone. The defendant additionally argues that the identification procedure was suggestive, and the resulting identification unreliable, because of pressure that the Meriden police allegedly placed on Baez, one week before the identification, "to identify someone—anyone—or be charged with murder and exposed to twenty-five years to life in prison." (Emphasis omitted.) We disagree.

---

"(E) That the eyewitness should not feel compelled to make an identification;

"(F) That the eyewitness should take as much time as needed in making a decision; and

"(G) That the police will continue to investigate the offense regardless of whether the eyewitness makes an identification;

"(4) In addition to the instructions required by subdivision (3) of this subsection, the eyewitness shall be given such instructions as may be developed and promulgated by the Police Officer Standards and Training Council and the Division of State Police within the Department of Emergency Services and Public Protection pursuant to subsection (b) of this section;

"(5) The photo lineup . . . shall be composed so that the fillers generally fit the description of the person suspected as the perpetrator and . . . so that the photograph of the person suspected as the perpetrator resembles his or her appearance at the time of the offense and does not unduly stand out;

"(6) If the eyewitness has previously viewed a photo lineup . . . in connection with the identification of another person suspected of involvement in the offense, the fillers in the lineup in which . . . the photograph of the person suspected as the perpetrator is included shall be different from the fillers used in any prior lineups;

"(7) At least five fillers shall be included in the photo lineup . . . in addition to the person suspected as the perpetrator;

"(8) In a photo lineup, no writings or information concerning any previous arrest of the person suspected as the perpetrator shall be visible to the eyewitness;

\* \* \*

"(11) The person suspected as the perpetrator shall be the only suspected perpetrator included in the identification procedure;

"(12) Nothing shall be said to the eyewitness regarding the position in the photo lineup . . . of the person suspected as the perpetrator;

"(13) Nothing shall be said to the eyewitness that might influence the eyewitness's selection of the person suspected as the perpetrator; [and]

"(14) If the eyewitness identifies a person as the perpetrator, the eyewitness shall not be provided any information concerning such person prior

State *v.* Villanueva

During the probable cause hearing, defense counsel asked to be heard on the defendant's motion to preclude Baez' October 14, 2020 out-of-court identification, arguing that the procedure by which the identification was obtained was unnecessarily suggestive because of the omitted instruction and the Meriden police officers' October 8, 2020 threats of prosecution. With respect to the instruction, defense counsel argued that the photographic array instruction sheet that Baez had signed on October 14, 2020, was incomplete under § 54-1p (c) (3) insofar as it was missing a second page containing the omitted instruction.[7]

When the trial court questioned the relevance of the October 8, 2020 interview to the issue of whether the identification procedure conducted "by a different police department" at a later date was unnecessarily suggestive, defense counsel responded: "The way that it impacts [the identification is that Baez] . . . could have reasonably believed, and I think reasonably did believe, that, in order for the investigation against her to stop, she had to provide them with somebody, and that kind of pressure is not conducive to reliability. Typically, our reliability cases concern disinterested eyewitnesses. In

to obtaining the eyewitness's statement regarding how certain he or she is of the selection . . . ."

[7] Although the second page of the instruction sheet contained five instructions, the defendant's claim in the trial court related only to the instruction advising the witness that the investigation would continue regardless of whether she identified someone from the photographic array. The following other four instructions were contained on the second page of the instruction sheet: "If there are other witnesses, you must not indicate to them that you have or have not made an identification of a person . . . . The officer administering this procedure either does not know whether any of the people in the photographic array or in the lineup were involved in the crime or does not know the order in which you are viewing the photographs . . . . If you do select someone, the officer will not be able to provide you any information about the person you have selected . . . . If you select a person or photograph you will be asked to provide a statement about this process and the results. If you don't recognize anyone in the lineup, please say so . . . ."

State *v.* Villanueva

this context, the police had shifted her into the role of a participant . . . .'' Counsel further argued, ''if you said to somebody, if you don't go and . . . cooperate or if you don't go and identify a witness, something bad will happen to you, that would be relevant to the court's assessment as to whether or not the person believed . . . they had to pick somebody out of [the photographic array], as opposed to just looking at the pictures.'' The court responded, ''so, your claim then is that there was a carryover'' from the October 8 interview to the October 14, 2020 photographic array, ''making the procedure [administered by the Manchester police officer] unnecessarily suggestive . . . ? Do you have any authority for that?'' When counsel replied that he had no authority, the court permitted him ''to explore with [Baez] the circumstances surrounding the [identification] procedure in an effort to try to lay a [factual] basis for [the claim] . . . .''

Thereafter, defense counsel asked Baez whether the Meriden police informed her during the October 8, 2020 interview that she ''[was] possibly in trouble for being associated with the murder,'' to which Baez replied, ''[t]hat's true.'' Counsel also asked her whether the police had told her, ''I'm going to find out who did it, and I need your help,'' to which Baez replied, ''I don't recall those exact words, but yes.'' She further stated, ''they . . . ask[ed] me if I had any connections in any way, shape or form with [the defendant]'' and ''ask[ed] . . . for . . . [my] help in trying to track [him] down . . . .'' Counsel asked Baez, ''[a]nd you understood from them that, if you didn't help them, you could be looking at . . . criminal charges, right?'' Baez replied, ''[t]hat was clear, yes.'' Counsel then asked Baez whether, when she was asked to look at the photographic array on October 14, 2020, she ''understood that it would be helpful for [her] . . . if [she] could identify somebody

State *v.* Villanueva

from [the] photos?" Baez replied, "[i]t would have been ideal, yes."[8]

After defense counsel finished questioning Baez, the prosecutor asked Baez, "did the Manchester officer that conducted the photo array [on October 14, 2020] . . . reiterate . . . that they could potentially charge you with . . . crimes" and "[d]id he [intimidate] you in any way?" When Baez replied, "[n]o sir," the following exchange occurred:

"[The Prosecutor]: . . . Safe to say there [were] no threats . . . made by the Manchester cop?

"[Baez]: Absolutely not; he was very helpful.

---

[8] At trial, defense counsel asked Baez again whether, when she identified the defendant, she thought "it would be ideal if [she] could be helpful to [the police]." At that time, Baez clarified that "[i]t wasn't a matter of being helpful to anybody . . . with respect to whatever it was that I was facing, it was just a matter of doing the right thing. . . . If I can help [the police], I'm gonna help." During redirect examination, the following exchange occurred between the prosecutor and Baez:

"[The Prosecutor]: You were asked some questions about being [threatened with prosecution]. Were you ever charged with this incident?

"[Baez]: No.

"[The Prosecutor]: Okay. Did the [Meriden] cops—when they met [you] the second time in Manchester [before the photographic array], did they [threaten] you again [with] charges and all that?

"[Baez]: No.

"[The Prosecutor]: How about the Manchester cop, did he threaten you at all?

"[Baez]: Not at all.

"[The Prosecutor]: Did he coerce you at all?

"[Baez]: No.

"[The Prosecutor]: Did he tell you at any time who to pick out of that lineup?

"[Baez]: No.

"[The Prosecutor]: You said you wanted to cooperate with the cops. You were just asked that a moment ago.

"[Baez]: Yes.

"[The Prosecutor]: Be helpful?

"[Baez]: Yes.

"[The Prosecutor]: How come?

"[Baez]: It's the right thing to do."

State *v.* Villanueva

"[The Prosecutor]: How about the Meriden cop, and I don't mean at your house . . . on [October 8, 2020], but [rather] when you made the photo identification, did he say once again, hey, we're going to charge you with murder and all that?

"[Baez]: No, sir.

"[The Prosecutor]: What was the exchange you had with him to the extent you had any exchange?

"[Baez]: They knocked on my door, I opened it. He said hey, [Baez], it's me again. I was like sure, come on in. He just introduced the Manchester police [officer] and . . . said . . . we have some pictures that we would like to . . . show you. I'm gonna step out of your apartment, and . . . [the Manchester officer is] gonna go over everything with you, and that's exactly what happened. . . .

"[The Prosecutor]: And then from then on, the Manchester [cop] showed you the pictures and [gave you] instructions . . . ?

"[Baez]: Yes, he read . . . things in depth, and he explained things in depth, and I was completely honest with him . . . [that] I wasn't sure . . . and he reassured me. He's like, if you're not sure, then you're not sure—you know. There was absolutely no pressure.

"[The Prosecutor]: Okay, and along those lines, did you feel pressure either from the Manchester police officer or from the Meriden detectives to pick someone out of that [photographic] lineup . . . ?

"[Baez]: No."

At the conclusion of the hearing, the trial court denied the defendant's motion to preclude Baez' identification, concluding that the identification procedure conducted by the Manchester police was not in any way suggestive. In reaching its determination, the court applied the test

State *v.* Villanueva

adopted in *State* v. *Harris*, 330 Conn. 91, 191 A.3d 119 (2018), for determining whether an out-of-court identification is admissible under the state constitution. See id., 131. The court found "zero evidence" that the officer who administered the procedure put any pressure on Baez to make an identification or that the procedure did not adhere to best practices in terms of the composition of the photographic array and the care taken to ensure Baez' attention was not directed toward the defendant's photograph. Likewise, the court found "zero evidence" that Baez spoke to anyone who would impact any matter the court have had to decide relative to the admissibility of the identification.

The trial court also rejected the defendant's contention that the omitted instruction rendered the identification procedure unnecessarily suggestive. In so doing, the court noted that, in *State* v. *Marquez*, 291 Conn. 122, 967 A.2d 56, cert. denied, 558 U.S. 895, 130 S. Ct. 237, 175 L. Ed. 2d 163 (2009), this court held that there is no presumption of suggestiveness, even when the police omit more critical instructions. See id., 162. The court further observed that the Manchester officer's instructions that the perpetrator's photograph may or may not be among the photographs in the array, that it was just as important to exclude innocent persons as it was to identify the perpetrator, and that Baez should not feel compelled to make an identification were more important than the omitted instruction in terms of reducing the procedure's potential suggestiveness. The court finally observed that, even if it was later determined that the procedure was unnecessarily suggestive, the identification itself was reliable and, therefore, admissible under the eight "estimator variables" adopted in *Harris* for determining the admissibility of identifications that are the product of unnecessarily suggestive identification procedures.[9]

_____

[9] We note that the defendant did not make any claim in the trial court with respect to the eight estimator variables and their impact on the overall

State *v.* Villanueva

On appeal, the defendant reasserts his claim that the Manchester police officer's failure to instruct Baez that the investigation would continue regardless of whether she identified a suspect, combined with the Meriden police officers' earlier threats of prosecution, gave rise to a substantial risk of misidentification and, therefore, that the identification should have been suppressed.[10] We disagree.

"[A] challenge to a trial court's conclusion regarding whether the pretrial identification procedure was unnecessarily suggestive presents a mixed question of law and fact. . . . [B]ecause . . . the reliability of an identification involves the constitutional rights of an accused . . . we are obliged to examine the record scrupulously to determine whether the facts found are adequately supported by the evidence and whether the court's ultimate inference of reliability was reasonable." (Citation omitted; internal quotation marks omitted.) *State* v. *Outing*, 298 Conn. 34, 50, 3 A.3d 1 (2010), cert. denied, 562 U.S. 1225, 131 S. Ct. 1479, 179 L. Ed. 2d 316 (2011).

reliability of the identification. When asked by the court whether defense counsel wished to make an argument with respect to the reliability prong of the *Harris* test, counsel responded only that the prosecutor had overstated the amount of time Baez spent with the defendant on the night in question, but, other than that, he had nothing more to add. On multiple occasions during the hearing, the trial court sought to clarify defense counsel's precise argument for precluding Baez' identification. The court summarized the argument at various times as follows: "The defendant claims the out-of-court identification is unnecessarily suggestive . . . for two reasons. First reason, the absence of certain warnings required by statute, [§] 54-1p (c) (3), and also what counsel has argued is a . . . spillover effect—from an interview that was conducted by the Meriden Police Department several days before the photo [identification] procedure in question was administered by the Manchester Police Department."

[10] Shortly before trial, the defendant filed a second motion to exclude Baez' out-of-court and possible in-court identification of him on several grounds, including those raised in the defendant's 2021 motion to preclude Baez' identification, which Judge Vitale had denied at the probable cause hearing. Judge Alander adopted Judge Vitale's prior ruling as the law of the case and denied the second motion.

460　　　　　　　　JULY, 2025　　　　　352 Conn. 439

State *v.* Villanueva

In *State* v. *Harris*, supra, 330 Conn. 115, this court adopted the burden shifting framework embraced by the New Jersey Supreme Court in *State* v. *Henderson*, 208 N.J. 208, 27 A.3d 872 (2011), for determining the admissibility of an eyewitness identification under the state constitution. We held, "as a matter of state constitutional law, that, when an eyewitness identification allegedly results from an unnecessarily suggestive procedure, the defendant has the initial burden of offering some evidence that a system variable undermined the reliability of the eyewitness identification. . . . If the defendant meets this burden, the state must then offer evidence demonstrating that the identification was reliable in light of all relevant system and estimator variables. . . . If the state adduces such evidence, the defendant must then prove a very substantial likelihood of misidentification." (Internal quotation marks omitted.) *State* v. *White*, 334 Conn. 742, 770, 224 A.3d 855 (2020).

"System variables are factors, such as lineup procedures, that are within the control of the criminal justice system." (Internal quotation marks omitted.) *State* v. *Harris*, supra, 330 Conn. 124 n.24. "Estimator variables are factors that stem from conditions over which the criminal justice system has no control and generally arise out of the circumstances under which the eyewitness viewed the perpetrator during the commission of the crime, such as lighting, distance or presence of a weapon." (Internal quotation marks omitted.) Id., 124 n.25. "When there is evidence of a suggestive procedure, the trial court should consider the eight estimator variables . . . identified in *State* v. *Guilbert*, [306 Conn. 218, 253–54, 49 A.3d 705 (2012)] in determining whether the identification is [nevertheless] reliable.[11]" (Footnote

---

[11] "The eight estimator variables . . . are: (1) there is at best a weak correlation between a witness' confidence in his or her identification and the identification's accuracy; (2) the reliability of an identification can be diminished by a witness' focus on a weapon; (3) high stress at the time of observation may render a witness less able to retain an accurate perception

State *v.* Villanueva

altered; internal quotation marks omitted.) *State* v. *White*, supra, 334 Conn. 770. When there is no evidence of a suggestive procedure, the reliability of the identification is generally a matter for the jury to decide. See, e.g., *State* v. *Harris*, supra, 132 ("[i]n the absence of evidence of a suggestive procedure or other extraordinary circumstances . . . we continue to believe that evidence relating solely to estimator factors that affect the reliability of the identification goes to the weight, not the admissibility, of the identification").

The first issue we must decide, then, is whether there was evidence of a suggestive identification procedure. The defendant argues that the Meriden police officers' prior threats of prosecution "coerced Baez' identification of the defendant" by giving her "a powerful incentive, fueled by self-interest, to . . . [select] a photo from the lineup despite her lack of confidence that anyone pictured was in fact the perpetrator." (Internal quotation marks omitted.) The defendant further argues that the officers' "highly coercive threat to charge Baez with murder unless she helped [them] was exacerbated by the [Manchester] officer's failure to instruct Baez . . . that the investigation would still continue, regardless of whether . . . [she] identified someone. Instead, Baez was left . . . with the . . . false . . . impression . . . that she only had two options: identify the perpetrator or take the fall for the murder."

and memory of the observed events; (4) cross-racial identifications are considerably less accurate than identifications involving the same race; (5) memory diminishes most rapidly in the hours immediately following an event and less dramatically in the days and weeks thereafter; (6) an identification may be less reliable in the absence of a double-blind, sequential identification procedure; (7) witnesses may develop unwarranted confidence in their identifications if they are privy to postevent or postidentification information about the event or the identification; and (8) the accuracy of an eyewitness identification may be undermined by unconscious transference, which occurs when a person seen in one context is confused with a person seen in another." (Internal quotation marks omitted.) *State* v. *White*, supra, 334 Conn. 770–71 n.15.

State *v.* Villanueva

The defendant's claim that earlier threats caused Baez to believe that she must identify someone or else she would be charged with murder is utterly at odds with Baez' testimony—which the trial court credited— that she felt "absolutely no pressure" to identify a suspect during the identification procedure that took place on October 14, 2020. Indeed, Baez testified that (1) the Manchester officer "reassured" her that it was perfectly fine if she did not identify a suspect, (2) she did not pick the defendant's photograph because of any threats or coercion by the Meriden police, and (3) when she stated that she wanted to help the police, that was because it was "the right thing to do," not because she thought it would benefit her personally. Given Baez' uncontroverted testimony in this regard, the trial court correctly concluded that the defendant's claim concerning the suggestiveness of the prior threats was baseless. See *State* v. *Henderson*, supra, 208 N.J. 290–91 ("If . . . at any time during the hearing the trial court concludes from the testimony that [the] defendant's initial claim of suggestiveness is baseless, and if no other evidence of suggestiveness has been demonstrated by the evidence, the court may exercise its discretion to end the hearing. Under those circumstances, the court need not permit the defendant or require the [s]tate to elicit more evidence about estimator variables; that evidence would be reserved for the jury."); see also *State* v. *White*, supra, 334 Conn. 772 ("like the court in *Henderson*, we conclude that [no further inquiry] ordinarily is . . . required when there is no evidence of a suggestive procedure").

We are not persuaded that the failure to instruct Baez that the investigation would continue regardless of whether she identified someone rendered the identification procedure suggestive. Although *Harris* adopted a new framework for assessing the reliability of an identification once it is determined to have been the

State *v.* Villanueva

product of a suggestive procedure; *State* v. *Harris*,
supra, 330 Conn. 131; the standard for assessing whether
a procedure was suggestive in the first instance remains
the same. That is, "any analysis of unnecessary sugges-
tiveness must be conducted in light of the totality of
the circumstances and must focus specifically on the
presentation of the photographic array itself as well as
the behavior of law enforcement personnel to deter-
mine if the procedure was designed or administered in
such a way as to suggest to the witness that a particular
photograph represents the individual under suspicion."
*State* v. *Marquez*, supra, 291 Conn. 161.

"The second factor [the behavior of the administering
officer], which is related to the first but conceptually
broader, requires the court to examine the actions of
law enforcement personnel to determine whether the
witness' attention was directed to a suspect because
of police conduct. . . . It stands to reason that police
officers administering a photographic identification
procedure have the potential to taint the process by
drawing the witness' attention to a particular suspect.
This could occur either through the construction of the
array itself or through physical or verbal cues provided
by an officer." (Internal quotation marks omitted.) *State*
v. *Outing*, supra, 298 Conn. 49.

In the present case, the defendant makes no claim
that the composition of the photographic array or the
conduct of the Manchester officer was suggestive in
the sense that either directed Baez' attention toward
the defendant's photograph. His claim concerns only
the Manchester officer's failure to instruct Baez, prior
to administering the procedure, that the investigation
would continue regardless of whether she identified
someone. As the trial court aptly noted, this court has
rejected claims that the failure to provide specific warn-
ings prior to an identification rendered an identification
procedure unnecessarily suggestive. See, e.g., *State* v.
*Marquez*, supra, 291 Conn. 162–63 (citing cases and

State *v.* Villanueva

observing that, "[e]ven if a court finds that the police expressly informed witnesses [contrary to established protocol] that the defendant would be in the array, our courts have found the identification procedure unnecessarily suggestive only when other factors exist that otherwise emphasize the defendant's photograph" (internal quotation marks omitted)).

This is not to say that preidentification instructions are irrelevant to the suggestiveness inquiry. In *Marquez*, this court "[found] it significant that the . . . photographic arrays contained a conspicuous might or might not be present warning, indicating to each witness that the perpetrator was not necessarily among those pictured and that the witnesses should not feel obligated to choose someone. The presence of such a warning is a consistent recommendation of the scientific literature . . . and is deemed to counteract effectively the tendency of witnesses to use relative judgment. . . . Moreover, this court expressly has endorsed . . . the use of such warnings and has recognized their potential prophylactic effect against the dangers of the relative judgment process."[12] (Citations omitted; internal quota-

_____

[12] In *State* v. *Ledbetter*, 275 Conn. 534, 571–73, 881 A.2d 290 (2005) (overruled in part on other grounds by *State* v. *Harris*, 330 Conn. 91, 191 A.3d 119 (2018)), cert. denied, 547 U.S. 1082, 126 S. Ct. 1798, 164 L. Ed. 2d 537 (2006), "this court acknowledged an ever growing body of empirical research demonstrating that eyewitnesses often engage in a relative judgment process, under which they tend to identify the person from the lineup who, in the opinion of the eyewitness, looks most like the culprit relative to the other members of the lineup . . . . This research concluded that [t]he problem with the relative judgment process . . . is that it includes no mechanism for deciding that the culprit is none of the people in the lineup, which, in turn, leads to a higher percentage of false identifications. . . . The research further concluded that the tendency to apply relative judgment could be significantly reduced when the administrator informed the witness that the perpetrator may or may not be present in the identification procedure. . . . Although this court agreed that the trial court, as part of its analysis, should consider whether such a warning had been given, the court determined that a per se rule deeming unnecessarily suggestive any identification procedure lacking such a warning to the witness should not be adopted." (Citations omitted; internal quotation marks omitted.) *State* v. *Sanchez*, 308 Conn. 64, 73–74, 60 A.3d 271 (2013).

State *v.* Villanueva

tion marks omitted.) Id., 162. It is undisputed that both of these instructions were given in this case.

In *Harris*, moreover, we rejected a claim by the amici curiae, the Connecticut Innocence Project and the Innocence Project, "that, for purposes of our state constitutional framework, any material violation of the identification procedures mandated by § 54-1p should render the identification inadmissible per se." *State* v. *Harris*, supra, 330 Conn. 134 n.32. Just as we were not persuaded by the amici's claim in *Harris*, we are not convinced that the failure to provide the omitted instruction in the present case, one of fifteen procedures mandated by § 54-1p; see footnote 6 of this opinion;[13] rendered the identification procedure suggestive per se. Rather, we continue to be of the view that the suggestiveness inquiry should "be made on an ad hoc basis, and . . . that the courts of this state should continue to evaluate whether individual identification procedures are unnecessarily suggestive on the basis of the totality of the circumstances surrounding the procedure, rather than replacing that inquiry with a per se rule." (Internal quotation marks omitted.) *State* v. *Marquez*, supra, 291 Conn. 156.

Applying this standard to the present case, we conclude that the totality of the circumstances supported

---

[13] As previously indicated; see footnote 7 of this opinion; the Manchester police officer failed to provide five instructions contained on the second page of the Meriden Police Department's photographic array instruction sheet. Although only the omitted instruction at issue in this appeal is expressly required by § 54-1p (c) (3) (G), subdivision (4) of § 54-1p (c) provides that, "[i]n addition to the instructions required by subdivision (3) of this subsection, the eyewitness shall be given such instructions as may be developed and promulgated by the Police Officer Standards and Training Council and the Division of State Police within the Department of Emergency Services and Public Protection pursuant to subsection (b) of this section . . . ." The defendant claims on appeal that the other four instructions were required by subdivision (4) but does not argue that their omission affected the suggestiveness of the identification procedure. We cannot perceive how their omission could have affected the suggestiveness of the procedure.

466 JULY, 2025 352 Conn. 439

State *v.* Villanueva

the trial court's determination that the failure to provide the omitted instruction did not render suggestive what was otherwise a properly conducted double-blind sequential array procedure. To be sure, as the defendant argues, the omitted instruction is one of several required instructions intended to assure witnesses that the case does not depend on them and that they need not feel any pressure to identify a suspect. When, however, the remainder of those required instructions are provided,[14] as they were in the present case, and there is no evidence that the witness actually thought the investigation would *not* continue if she failed to identify a suspect, the failure to provide the omitted instruction will not render what was otherwise a textbook double-blind sequential identification procedure suggestive.

III

The defendant next claims that the trial court violated his sixth amendment right to confrontation[15] under *Smith* v. *Arizona*, 602 U.S. 779, 144 S. Ct. 1785, 219 L. Ed. 2d 420 (2024), by allowing Associate Medical Examiner Jacqueline Nunez to testify regarding the victim's injuries and cause of death, even though another medical examiner, Dollett White, performed the autopsy. The defendant argues that Nunez "impermissibly conveyed the testimonial statements of the absent . . . White as the basis of [her] own conclusions." In particular, the defendant argues that a photograph of a metal probe inserted through the victim's four neck wounds communicated White's apparent conclusion

_____

[14] It is undisputed that the Manchester officer instructed Baez that it was "just as important to exclude innocent persons as it is to identify the perpetrator," that "[t]he perpetrator may or may not be among the persons in the photographic lineup" and that "[y]ou should not feel that you must make an identification . . . ."

[15] The sixth amendment right to confrontation is made applicable to the states through the due process clause of the fourteenth amendment. See, e.g., *Pointer* v. *Texas*, 380 U.S. 400, 403, 406, 85 S. Ct. 1065, 13 L. Ed. 2d 923 (1965).

State *v.* Villanueva

that a single bullet caused all four wounds and that this photograph and Nunez' testimony regarding the neck wounds were testimonial hearsay. The defendant further argues that Nunez conveyed the following additional hearsay statements during her testimony: "White performed an external and internal investigation of the victim's body. . . . White recovered a bullet from the victim's midsection. . . . The bullet injured the victim's spine, colon, and a large artery . . . [and] [t]he arterial injury caused 'approximately two liters' of internal bleeding." (Citations omitted.) For the reasons that follow, we conclude that the probe photograph and Nunez' testimony interpreting that photograph were not hearsay and that, to the extent some of the cited hearsay statements were improperly admitted, the state has sustained its burden of demonstrating that the error was harmless beyond a reasonable doubt.

The following facts are relevant to our resolution of this claim. At trial, the defendant sought to preclude Nunez' testimony on the ground that she had not performed the victim's autopsy. The trial court allowed defense counsel to voir dire Nunez outside the presence of the jury to ascertain the bases for her conclusions regarding the victim's injuries. At that time, Nunez stated that, although she had reviewed White's autopsy report, her opinions would be based solely on her review of the victim's autopsy photographs. Defense counsel then showed Nunez a photograph depicting a metal probe threaded through four perforations in the victim's neck and asked her whether she could tell if the neck perforations were caused by one or two bullets. Nunez responded that the photograph was "consistent with either one . . . projectile causing all [four] perforations or two separate projectiles causing the four [perforations]" but that she could not say for sure. Nunez agreed that, were it not for the metal probe photograph, she would not be able to conclude that

State *v.* Villanueva

one projectile could have caused two entrance wounds. She also agreed that she could not determine from the photograph "the degree to which the probe had to be manipulated or pushed to line up those holes." On the basis of this testimony, defense counsel argued that the prosecutor would ask Nunez "to render an opinion about a photograph [that] . . . documents a particular test that was done by a [different] medical examiner" and that, if Nunez were allowed to testify about this particular photograph, the defendant would "lose the right of confrontation on . . . a critical issue in this case," namely, whether the victim was shot two or three times.

The trial court responded that there could be no confrontation clause violation if Nunez based her opinions on the photographs alone and that defense counsel would be able to cross-examine her "as to whether she [could] actually give [an] opinion not knowing things you think she should know [about the probe] . . . ." The court further stated, "what this witness won't be able to do is tell the jury what [White's] conclusions were . . . . And if she, on the stand, says 'from that photograph, I make the following conclusions,' that's okay, and [it] is admissible. And you're free to cross-examine her as to how [she] can . . . [draw] that conclusion when [she doesn't] know [certain facts pertaining to the insertion of the probe]."

At the conclusion of voir dire, the prosecutor clarified that the state was not seeking to admit White's autopsy report and that the only questions he intended to ask Nunez pertained to "the nature of the [victim's] wounds, both internal and external, the number of wounds, and the cause and manner of death." The court then asked Nunez, "can you give those opinions . . . without referencing any [of the] opinions or conclusions . . . of . . . White? [Will] these [be] your own independent conclusions?" Nunez responded that the opinions she

State *v.* Villanueva

expressed would be her own and would be based entirely on her review of the autopsy photographs.

Thereafter, upon direct examination, Nunez was shown a series of autopsy photographs and was asked to explain what each one depicted. The autopsy report was not entered as a full exhibit at trial. With respect to the photograph of the metal probe in the victim's neck, Nunez testified generally about the use of probes. She explained that probes are often used to determine a bullet's trajectory. She further testified that the victim's four neck perforations were all superficial skin wounds that could have been caused by either one or two bullets but that she could not say for sure. Nunez opined, on the basis of the photograph, that the four perforations resulted from either one bullet that entered and exited twice, or two bullets that each entered and exited once. Nunez further testified that only one of the four perforations resembled an entrance wound. The others, she stated, were "ambiguous," although their irregular edges were more consistent with exit wounds. Nunez was also shown a photograph of a wound in the center of the victim's lower back, which she testified was a single entrance wound for which there was no corresponding exit wound. She testified that the projectile that entered the lower back had damaged the victim's lower spinal cord, colon, and a large artery, causing him to lose approximately two liters of blood.

During cross-examination, Nunez repeated that she did not perform the autopsy and that her knowledge was based on a review of the photographs and the autopsy report. Defense counsel asked Nunez whether it would have required a considerable amount of force or manipulation to insert the probe into the victim's neck wounds. Nunez responded that she could not tell from the photographs how much, if any, force or manipulation was involved but that it could have required some of each. Defense counsel also asked Nunez, "your

State *v.* Villanueva

expertise . . . as a medical examiner . . . only allows you to conclude what the body tells you. . . . And, in this particular case, what . . . the body has told you is what the photographs have told you. Is that fair to say?" Nunez responded, "[y]es."

The following legal principles guide our analysis of the defendant's claim. The confrontation clause bars admission of "testimonial statements of a witness who did not appear at trial unless [the witness] was unavailable to testify, and the defendant had a prior opportunity for cross-examination." *Crawford* v. *Washington*, 541 U.S. 36, 53–54, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004). The clause's prohibition "applies only to testimonial hearsay . . . ." *State* v. *Slater*, 285 Conn. 162, 170, 939 A.2d 1105, cert. denied, 553 U.S. 1085, 128 S. Ct. 2885, 171 L. Ed. 2d 822 (2008). Relevant for purposes of the questions presented here is that the confrontation clause bars only the introduction of hearsay, meaning "a statement, *other than one made by the declarant while testifying at the proceeding*, offered in evidence to establish the truth of the matter asserted." (Emphasis added.) Conn. Code Evid. § 8-1 (3). In *State* v. *Walker*, 332 Conn. 678, 212 A.3d 1244 (2019), we explained that "the threshold inquiries [for purposes of] a confrontation clause analysis are whether the statement was hearsay, and if so, whether the statement was testimonial in nature . . . . These are questions of law over which our review is plenary." (Citation omitted; internal quotation marks omitted.) Id., 690.

The defendant claims that his right to confrontation was violated because the probe photograph communicated White's purported conclusion that a single bullet caused the four neck wounds and because Nunez' testimony that the wounds could have been caused by one or two bullets did nothing more than convey the out-of-court testimonial statements of White from the autopsy report. The defendant is essentially arguing that both

State *v.* Villanueva

the photograph and Nunez' statement interpreting the photograph were hearsay statements. We disagree and conclude that the probe photograph was not hearsay and that Nunez' testimony about the neck wounds was based solely on her review and interpretation of the probe photograph, not on White's autopsy report.

As we have explained, the confrontation clause bars the admission of "testimonial statements" when certain conditions are met. See, e.g., *Crawford* v. *Washington*, supra, 541 U.S. 68–69. Section 8-1 (1) of the Connecticut Code of Evidence defines "[s]tatement" as "(A) an oral or written assertion or (B) nonverbal conduct of a person, if it is intended by the person as an assertion." Conn. Code Evid. § 8-1 (1). The question presented, therefore, is whether the probe photograph depicts nonverbal conduct of White intended as an assertion.

Contrary to the defendant's contention, the photograph does not state or imply that one bullet caused these wounds. It simply depicts an image of the victim's body with a probe inserted through four wounds. The probe photograph does not include or depict any words, gestures, or some other indicative content that can reasonably be understood as an assertion. It does not convey White's intention with respect to the probe; it does not communicate how the probe was inserted, why the probe was inserted, what White intended the probe to show, or what conclusions she drew from the probe. Nunez testified that probes generally are used to determine the trajectory of a bullet but are also used to determine whether a wound is a bullet wound or whether two or more wounds are connected. Here, however, the photograph does not convey White's reason for inserting the probe, which could have been for one or more of the purposes identified by Nunez. We do know, however, that Nunez relied on the photograph to deduce and communicate her own conclusions about the wounds. Nunez testified that, while looking at the

State *v.* Villanueva

photograph, she could not state with a reasonable degree of medical certainty whether one or two bullets had caused the wounds depicted in the photograph. Finally, in providing her opinion of the probe photograph, Nunez did not reference White's process for inserting the probe, the autopsy report, or what, if any, conclusions White documented in that report with respect to the probe. Rather, Nunez relied on the probe photograph's objective depiction of the wounds and patterns.

This court has held that medical examiners may testify regarding a victim's injuries, even though they did not perform the autopsy, so long as their testimony is based solely on the autopsy photographs. See, e.g., *State* v. *Robles*, 348 Conn. 1, 11, 301 A.3d 498 (2023) ("to the extent that the defendant challenges the admission of [the substitute medical examiner's] testimony concerning the autopsy photographs, the admission of that testimony did not violate the confrontation clause . . . [because] [t]his portion of [the witness'] testimony was based solely on his examination of the autopsy photographs, not on the autopsy report"). *Robles* did not present the question of whether the photographs relied on by the testifying medical examiner were hearsay, and the defendant points to no case that supports his claim that autopsy photographs are testimonial hearsay. Indeed, the overwhelming weight of authority suggests that they are not hearsay unless the photographs contain words, markings, or some other indicative contention that can reasonably be understood as an assertion. See, e.g., *United States* v. *Clotaire*, 963 F.3d 1288, 1295 (11th Cir. 2020) ("pictures are not statements at all, let alone testimonial ones"), cert. denied,    U.S.    , 141 S. Ct. 1743, 209 L. Ed. 2d 508 (2021); *United States* v. *Brooks*, 772 F.3d 1161, 1167 (9th Cir. 2014) ("As the [United States] Supreme Court explained in *Crawford* . . . the [c]onfrontation [c]lause applies to

State *v.* Villanueva

witnesses against the accused—in other words, those who bear testimony. . . . Testimony, in turn, is typically a solemn declaration or affirmation made for the purpose of establishing or proving some fact. . . . The photographs of the seized parcel were not witnesses against [the defendant]. They did not bear testimony by declaring or affirming anything with a purpose.'' (Citations omitted; internal quotation marks omitted.)); *United States* v. *Wallace*, 753 F.3d 671, 675 (7th Cir. 2014) (''Pictures can convey incriminating information (think of the famous scene in [the movie] Blow-Up[16] in which David [Hemmings'] processing of a photo negative finally reveals the corpse). But one can't cross-examine a picture.'' (Footnote added.)), cert. denied, 574 U.S. 1160, 135 S. Ct. 1399, 191 L. Ed. 2d 372 (2015); *People* v. *Leon*, 61 Cal. 4th 569, 603, 352 P.3d 289, 189 Cal. Rptr. 3d 703 (2015) (''It is clear that the admission of autopsy photographs, and competent testimony based on such photographs, does not violate the confrontation clause. Hearsay is defined as an out-of-court 'statement.' . . . A statement is defined for this purpose as an 'oral or written verbal expression or . . . nonverbal conduct of a person' intended as a substitute for oral or written expression. . . . Only people can make hearsay statements; machines cannot.'' (Citations omitted; emphasis omitted.)); *State* v. *Pruett*, 263 Neb. 99, 108–109, 638 N.W.2d 809 (2002) (''[T]he autopsy photographs were not oral or written assertions, nor were they nonverbal conduct of a person. Under these circumstances, photographs are demonstrative evidence and are not hearsay.''); *Wood* v. *State*, 299 S.W.3d 200, 214–15 (Tex. App. 2009) (There was no confrontation clause violation when ''[t]he bulk of [the medical examiner's] testimony was devoted to describing and explaining what was shown in the photographs taken during the autopsy. A photograph is not an out-of-court statement.'').

---

[16] Blow-Up (Metro-Goldwyn-Mayer, Inc. 1966).

State *v.* Villanueva

Contrary to the defendant's claim, this issue is not "squarely controlled" by *Smith* v. *Arizona*, supra, 602 U.S. 779. In *Smith*, the United States Supreme Court held that "[a] [s]tate may not introduce the testimonial out-of-court statements of a forensic analyst at trial, unless she is unavailable and the defendant has had a prior chance to cross-examine her. . . . Neither may the [s]tate introduce those statements through a surrogate analyst who did not participate in their creation. . . . And nothing changes if the surrogate . . . presents the out-of-court statements as the basis for his expert opinion. Those statements, as we have explained, come into evidence for their truth—because only if true can they provide a reason to credit the substitute expert. So a defendant has the right to cross-examine the person who made them." Id., 802–803. In the present case, however, no testimonial, out-of-court statement made by White about the neck wounds was introduced through Nunez. Indeed, Nunez never mentioned any of White's findings or conclusions, including whether White believed the neck perforations were caused by one bullet or thought, as Nunez did, that they could have been caused by one or two bullets. As *Smith* makes clear, the confrontation clause prevents the state from introducing testimonial, out-of-court *statements*. See id. In the present case, because no such statement about the neck wounds was introduced through Nunez, *Smith* is not controlling. Because we conclude that the photograph in the present case was not hearsay, we do not reach the question of whether it was testimonial.

The defendant next claims that Nunez' testimony that (1) White "performed an external and internal investigation of the victim's body," (2) White "recovered a bullet from the victim's midsection," (3) "[t]he [midsection] bullet injured the victim's spine, colon, and a large artery," and (4) "[t]he arterial injury caused 'approximately two liters' of internal bleeding" was inadmissible

State *v.* Villanueva

testimonial hearsay that Nunez could have known only by reading White's autopsy report. Even if we assume that these statements were improperly admitted, we nevertheless conclude that their admission was harmless beyond a reasonable doubt.[17] See, e.g., *State* v. *Merriam*, 264 Conn. 617, 649, 835 A.2d 895 (2003) ("[a]s with other constitutional violations that are subject to harmless error analysis, the state has the burden of demonstrating that a confrontation clause violation was harmless beyond a reasonable doubt").

As previously indicated, the sole issue before the jury was whether the defendant or someone else—ostensibly Pacheco—killed the victim. There was no dispute over the cause of the victim's death. He died from a gunshot wound to his lower back. Evidence from Nunez that White had performed an external and internal investigation of the victim's body, recovered a bullet from his midsection, and measured two liters of blood was, therefore, not harmful to the defendant. To the contrary, such evidence supported one of his defense theories. Defense counsel argued at trial that, if the jury believed the defendant was the individual who shot the victim in the parking lot, Nunez' testimony that the superficial wounds on the victim's neck could have been caused by two bullets meant that the defendant did not deliver the fatal shot to the victim. Instead, that shot was likely delivered by Pacheco. Consequently, none of Nunez' testimony regarding the abdominal injuries could have affected the verdict. See, e.g., *State* v. *Johnson*, 345 Conn. 174, 196, 283 A.3d 477 (2022) ("the test for determining whether a constitutional [error] is harmless . . . is whether it appears beyond a reasonable doubt that the [error] complained of did not contribute to the verdict obtained" (internal quotation marks omitted)).

---

[17] Given our disposition, we need not decide whether these statements, or the autopsy report more generally, are testimonial hearsay.

State *v.* Villanueva

As to the strength of the state's case, two different people identified the defendant as the person who shot the victim. One of them, Crespo, had known the defendant his entire life. The other, Baez, was standing next to the defendant when the shooting occurred and had a number of face-to-face interactions with the defendant prior to the shooting. Moreover, the surveillance footage showed the victim convulse violently when the first bullet struck him, providing powerful evidence as to the identity of the person who inflicted his fatal injuries. Finally, the defendant's DNA was recovered from a beer can that the shooter in the surveillance footage threw at the victim minutes before shooting him. In short, evidence of the defendant's guilt was overwhelming. See, e.g., *State* v. *Campbell*, 328 Conn. 444, 512–13, 180 A.3d 882 (2018) (confrontation clause violation was harmless when evidence of guilt was overwhelming).

Despite the state's substantial evidence, the defendant contends that, but for a portion of Nunez' testimony, the jury reasonably could have found that the victim was struck by three bullets, rather than two, and, on the basis of this finding, reasonably could have concluded that Pacheco, rather than the defendant, was the actual killer. The only evidence supporting this theory consists of several still photographs from the surveillance footage indicating that, after leaving the café, Pacheco drove his Chevrolet Malibu around the block, which would have taken him past the turnoff to Foster Court, where the victim's body was found. According to the time stamps on these photographs, however, Pacheco's trip around the block, which began approximately one minute after the defendant shot the victim, took Pacheco approximately seventy-two seconds to complete. During this time frame, no one reported hearing any additional gunshots in the vicinity of the café. Nor was there any evidence that Pacheco knew that the victim was parked on Foster Court, much less that

State *v.* Villanueva

Pacheco stopped at that location, found the victim, shot him, and returned to the front of the café in that short length of time. In light of the foregoing, we conclude that, even if some of the cited testimony was improperly admitted, the state has sustained its burden of demonstrating that the error was harmless beyond a reasonable doubt.

The judgment is affirmed.

In this opinion the other justices concurred.